YELVERTON, Judge.
Clarence L. “Nate” Durham sued Gros Jean Roofing and Sheet Metal Company, and Transportation Insurance Company, the latter’s insurer, for personal injury damages received in an automobile accident in Natchitoches, Louisiana, on July 18, 1984. As Durham was driving down a street, a dump truck owned by Gros Jean and driven by its employee, Joe Webb, Jr., entered the street from a private drive and ran into the right side of Durham’s van. The case was tried by a jury. The presiding judge directed a verdict in plaintiff’s favor on the issue of liability, and the jury decided the amount of damages. The verdict sheet returned by the jury was filled out like this:
(a) Pain and suffering.$10,000.00
(b) Mental anguish.$10,000.00
(c) Embarrassment and humiliation .$ -0-
(d) Permanent injuries .$ -0-
(e) Loss of earnings and earning capacity (past, present & future).$ 5,000.00
The parties had stipulated that Durham had suffered property damages of $2,566 and medical expenses, past, present and future, of $7,500. Adding together the stipulated amounts and the jury’s award, the trial judge rendered judgment in favor of plaintiff for $35,066.
The issue raised by the plaintiff’s appeal is that the damage award was so low, in the light of his proved injuries, that it was an abuse of discretion. We agree, and increase the general damage award from $20,000 to $50,000, which we believe is the lowest amount within the jury’s discretion that could have been awarded for the plaintiff’s unquestionable damages resulting from this accident.
Durham was a United States Customs agent. When he retired from that job he moved back to his original home in Winn-field to enjoy the outdoors, his primary interest in life being hunting and fishing. He also started a second career as an outdoor writer, publishing in a local periodical a regular column styled “Nate Durham Outdoors”. His writing career was not a financial success, as the four income tax returns preceding the year of his accident attested; during those years his hunting and fishing trips for writing material cost him more than the income the stories produced, and during those years he regularly reported net losses to the IRS. About four months before his accident he began working for an automobile dealer selling cars as a means to supplement his retirement income. He made about $2,000 selling cars during those four months.
The jury awarded Durham $5,000 for his economic loss. We affirm that award. Dr. Earl Thames, an expert economist, testified that he had a salary loss from the accident date until the date of trial in the amount of $73,863, and that the loss of future earning capacity calculated out to be $63,725, for a total of $137,588. Dr. Thames’ calculations were based on the assumption that he would make $20,000 a year as an automobile salesman, and that he could not be an automobile salesman any longer. This expert had not seen Durham’s income tax returns. The evidence shows, too, that although Durham started selling cars four months before his acci *681 dent, he took off for one month before the accident to carry out some earlier plans concerning one of his hobbies, and not long after his accident the dealership that he was working for went out of business. He did not testify that he had actively sought to reenter the car-selling field, and there was no testimony to indicate that he was or would be physically unable to meet the part-time demands of such a job. All factors considered, the jury could have reasonably concluded that Durham had no plans to pursue automobile salesmanship as a serious career, and that his brief excursion into that field was not reliably indicative of his earning probabilities. He had been retired for several years, and during that time had worked for only three months, and earned only $2,000. The jury could have reasonably concluded that there was an unstable factual foundation for Dr. Thames' calculations. Considering Durham’s apparent commitment to his outdoor interests we cannot regard the jury’s assessment of his economic loss at $5,000 so low as to be an abuse of discretion.
The jury concluded that a total of $20,000 would adequately compensate Durham for his pain and suffering, and mental anguish, and the jury assessed zero damages for embarrassment and humiliation, and permanent injuries.
Durham, 63, was in good health at the time of the accident. Dr. Roy A. Cook of Natchitoches was the first doctor to see him after the wreck. He put Durham in the hospital for three days with a fractured tenth left rib and considerable back pain. Although it was not discovered at that time, Durham had a fractured left kidney. Dr. Cook prescribed pain relief medication and physical therapy. Durham went back to see Dr. Cook on July 24 complaining that his back pain was worse. Dr. Cook sent him to Dr. John P. Sandifer, an orthopedist.
Dr. Sandifer saw Durham on July 25, 1984 and again on April 9,1985. It was his opinion that Durham had suffered an acute exacerbation of what he found to be a great deal of degenerative arthritis in the neck and the back. This doctor testified that on the occasion of his examinations he was not aware that there had been a fractured rib, and, like Dr. Cook, he was also unaware of the fractured kidney.
Durham testified that about a week after the accident he began to see blood in his urine. One of his children helped him get an appointment with Dr. Katherine S. Thompson of Houston, affiliated with the University of Texas Medical School. Dr. Thompson, a nephrology specialist (kidney disease), saw Durham on October 3, 1984. She said that Durham was quite worried, and understandably so because blood in the urine is always a serious problem. He was tested by an intravenous urogram which showed a fracture of the left kidney. Dr. Thompson testified that it takes a significant force or impact to fracture a kidney. However, she said that a kidney damage like this would normally heal in a couple of months by itself, and she considered the injury minor and not needing hospitalization.
Nevertheless, on that day Durham entered the Veteran’s Administration Medical Center in Houston where he stayed from October 3, 1984 until December 4, 1984. The hospital records for that admission show that the admission was primarily for paranoia. The admission summary further shows that the patient had a history of depression and paranoid ideations. The records listed two reasons for this hospitalization: (1) paranoid ideations, (2) degenerative joint disease affecting the back.
He spent another period, April 3, 1986, to April 16, 1986, in the VA Hospital in Houston for the same complaints.
At trial and on this appeal Durham complained that the accident caused an exacerbation of symptoms of a preexisting degenerative condition in his neck and back. He testified, as did other witnesses who knew him, that before this accident he was very active, hunting and fishing for days at a time, walking long distances in mountainous terrain in Colorado, lifting boats, game and equipment, and otherwise manifesting that he was in sound physical condition. He said that the arthritic condition did not bother him then. Beginning, however, after the accident and growing worse as time *682 went by, there was pain in his neck and back which by the time of trial had curtailed most of his activities and eliminated entirely the more strenuous ones.
Dr. Earle U. Schraff, Jr., of Fort Worth, Texas, who specializes in rheumatic diseases and runs an arthritis clinic in Fort Worth, knew plaintiff personally, having fished with him on numerous occasions. He testified that when he learned about Durham’s continuing problems after the accident, he brought him to Fort Worth and did some studies on April 30 and May 1, 1985. Durham’s worst problem at that time was a constant burning pain in the lumbosacral area. This doctor’s narration of the history of the patient taken at the time of these studies was unusual in that it contained the doctor’s own observations of Durham’s previous asymptomatic condition —the doctor himself was a fact witness. The doctor said:
Well, when I saw him, I didn’t think there was any question from the history that he had suffered an injury to his lumbar area. And it was severe enough that it was now into its — nearly finishing one year, without a lot of improvement. I didn’t think that an operation would likely to [sic] be of much value and that he should have a conservative program, which is very hard to do. It would include a vigorous exercise program, with a weight reduction program. And it’s not available to him. There are very few places that he can go and get this, but where he lives, I didn’t know of any place.
He was sent to Dr. Samuel Stewart Morgan, an osteopathic physician on August 31, 1985. This doctor recorded a history of no symptoms before the accident, but continued pain in the low back and neck thereafter. He diagnosed degenerative disc disease and treated Durham on several visits thereafter, relieving some of the neck problem but not the low back.
Durham went back to Dr. Schraff in Fort Worth for more studies on February 11, 1986. When he was questioned on June 3, 1987. at the taking of his deposition, regarding causation of Durham’s symptoms following the accident, Dr. Schraff said:
Well, based on the history that he had been in good health, with no back problem prior to the accident, and then, with his story since that time, with the objective evidence that we had on a physical, and his continuing effort to try to get some kind of relief, this man went — I don’t know how many different kinds of doctors he went to. He had osteopathic munipulation, [sic] he — we had him back here and put him in the hospital in February of ’86. And I had my orthopod and my neurosurgeon see him, Doctor William R. Burnell and Doctor Joseph Gains. And we did an MRI, which is a newer technique than the CAT scan, and here again, the results were not definite but did show disease at L-5, S-l and L-4,5 levels, not as bad as some people have. There were degenerative changes and there was some posterior extention [sic] of the ■ disc material which just reached the anterior border of the dural sac and might produce minimal indentation. The orthopod suggested that he have a myelogram and consideration of a diskogram, these are all pointing toward an operation.
This doctor was then testifying three years after the accident, and it was his opinion that the plaintiff had not improved and was possibly worse. His prognosis was that if the pain got too bad, an operation would be necessary. If Durham could stand it, conservatively the doctor would say he was just going to have to learn to live in and manipulate within the framework of his condition. Dr. Schraff believed that Durham would continue to suffer the restrictions and constraints on his physical activities indefinitely. It was his opinion that the accident was the triggering mechanism for all of Durham’s problems.
Dr. Gordon McRae Mead did an evaluation examination on September 1, 1987. He conceded that this accident precipitated the plaintiff’s pain and discomfort, but testified that probably ten or fifteen years later, Durham would have become symptomatic whether he had suffered an accident *683 or not, but he of course could not be sure of that.
We can not determine from this record what caused the jury to practically ignore the extremely one-sided and practically undisputed medical testimony that plaintiffs permanent back pain and disability is a direct result of the accident in July 1984. Perhaps the jury placed too much emphasis on the fact that the root cause of plaintiffs problems was his preexisting arthritic condition, for which the defendants were not responsible, and that the reflections in the hospital records that plaintiff suffered from some kind of paranoid condition rendered his testimony suspect. If these were the factual bases on which the jury rested its award, then we find that the jury was clearly wrong in reaching such conclusions. The unanimous medical testimony of all of his treating physicians was of the opinion that the accident triggered the symptoms, and that Durham’s pain and disability was real and objectively discernible. There was no medical testimony whatsoever regarding the impact of some mental state on his overall health condition. The lay testimony unanimously showed an active individual, demonstrating good health and vigor before the accident, following which there has been a steady increase in pain all along the spine, and a sharp reduction in activities. This is not the usual case where there is some medical testimony in support of plaintiffs contentions, and other medical testimony opposing his contentions, where the manifest error and abuse of discretion standards of appellate review require us to defer to the reasonable findings of the trier of fact. Here, the weight of the evidence heavily preponderates in Durham’s favor, as to the seriousness and extent of his injury, and it is our opinion that the jury abused its discretion in making a general damages award of only $20,000.
In our view, $50,000 was the lowest amount within the jury’s discretion that could have been awarded for the plaintiff’s unquestionable damages resulting from this accident, and the judgment will be amended to so reflect.
For the reasons assigned the judgment of the trial court will be amended to increase general damages from a total of $20,000 to $50,000. In all other respects the judgment of the trial court is affirmed. Defendants will pay the cost of this appeal.
AMENDED AND AFFIRMED.