776 So.2d 21 (2000)
Pennie MOSLEY, Individually and as Tutrix of Her Minor Daughter, Victoria Mosley
v.
METHODIST HEALTH SYSTEM FOUNDATION, INC. d/b/a Pendleton Memorial Methodist Hospital.
No. 99-CA-3116.
Court of Appeal of Louisiana, Fourth Circuit.
November 15, 2000.
Rehearing Denied January 31, 2001.
*22 Darleen M. Jacobs, Jacobs & Sarrat, New Orleans, Louisiana, Counsel for Plaintiff/Appellant.
Suzanne P. Keevers, Metairie, Louisiana, Counsel for Defendant/Appellee.
Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge PATRICK M. SCHOTT, Pro Tem.
KIRBY, Judge.

STATEMENT OF THE CASE
On February 13, 1997, fourteen-year-old, Victoria Mosley, went to visit her grandmother in the Intensive Care Unit at Pendleton Memorial Methodist Hospital. Victoria Mosley sustained personal injuries due to a slip and fall in her grandmother's room. Pennie Mosley, Victoria's mother, filed suit against Pendleton on behalf of her fourteen-year-old daughter, Victoria. Plaintiff alleged that she slipped and fell in urine because a nurse negligently failed to connect a tube attached to the patient's Foley catheter.
Victoria Mosley was treated at the emergency room at Methodist Hospital immediately following her accident, at no charge. Thereafter, she treated with Dr. Essam Elmorshidy, a Board Certified Orthopaedic Surgeon. Upon examination by Dr. Elmorshidy, Victoria Mosley reported back pain, left hip pain, left knee and left foot pain.
Trial on the merits was held before the Honorable Robin M. Giarrusso. Pennie and Victoria Mosley each testified that after the accident she saw "a little tube" disconnected from the patient's Foley catheter and leaking urine on the floor. Neither witness could say when the catheter was last serviced by a nurse before the fall. Both testified that many relatives were visiting Theresa Mosley that evening, going in and out of the patient's room just prior to the fall.
Diane Larmann, R.N., a board certified critical care nurse, testified for defendant. She said that she cared for Theresa Mosley on February 13, 1997 from 7 a.m. to 7 p.m. She took vital signs at 6 p.m., measured urine output at that time, and emptied the urometer into the gravity collection bag. She testified that she had a good, lighted view of the floor and that she noticed no liquid on the floor. Diane Larmann explained that the urometer and the collection bag are one unit. There are no holes or "disconnections" possible when emptying the urometer into the collection bag. Nurse Larmann further testified that if a Foley catheter was not connected to the urinary collection bag, urine would leak into the patient's bed, not on the floor. She testified that the fall was reported to her by Victoria Mosley and two others at 6:18 p.m. However, the hospital's accident report stated that it occurred 6:40 p.m. *23 Upon inspecting the collection bag after the accident, Nurse Larmann observed a small amount of urine that had leaked onto the floor. Ms. Larmann's recollection and trial testimony was consistent with the interview she gave to an investigator shortly after the incident.
Using the burden of proof for an accident on a merchant's premises, the court awarded judgment in favor of defendant hospital and against Pennie Mosley on July 14, 1999. The judge assigned written reasons finding no negligence on the part of the hospital. Plaintiff filed a devolutive appeal, which we now address.

STATEMENT OF THE LAW
LSA-R.S. 9:2800.6 sets the burden of proof in a claim for injuries caused by a condition on a merchant's premises. LSA-R.S. 9:2800.6 expressly applies to "merchants" as defined therein, and hospitals are not covered by that statute. (Emphasis added.) Reynolds v. St. Francis Medical Center, 597 So.2d 1121, 1122 (La.App. 2d Cir.1992); Neyrey v. Touro Infirmary, 94-0078 (La.App. 4 Cir. 6/30/94), 639 So.2d 1214, 1217. Nevertheless, in the trial court's Reasons for Judgment it stated:
When there is a condition on the premises which poses an unreasonable risk of harm, it must still be shown that the hospital either created the condition, or had actual notice of the condition and failed to exercise reasonable care.
This is the burden of proof that LSA-R.S. 9:2800.6 establishes, and as such should not have been used in this case where the accident occurred on a hospital's premises, instead of a merchant's premises.
The proper burden of proof in a claim for injuries caused by a condition in a hospital is set forth in Neyrey v. Touro Infirmary, 94-0078 (La.App. 4 Cir. 6/30/94), 639 So.2d 1214.
A plaintiff in a slip and fall case against a hospital must show the fall occurred and injury resulted from a foreign substance on the premises. Reynolds v. St. Francis Medical Center, 597 So.2d 1121, 1122 (La.App. 2d Cir.1992); LeBlanc v. Alton Ochsner Medical Foundation, 563 So.2d 312, 315 (La.App. 5th Cir.1990); Bordelon v. Southern Louisiana Health Care Corp., 467 So.2d 167, 169 (La.App. 3rd Cir.), writ den. 469 So.2d 989 (La. 1985). The burden then shifts to the hospital to exculpate itself from the presumption of negligence. Reynolds v. St. Francis Medical Center, supra, citing LeBlanc v. Alton Ochsner Medical Foundation, supra. A hospital owes a duty to its visitors to exercise reasonable care commensurate with the particular circumstances. Reynolds v. St. Francis Medical Center, supra at 1123. The hospital must show that it acted reasonably to discover and correct the dangerous condition reasonably anticipated in its business activity. LeBlanc v. Alton Ochsner Medical Foundation, supra at 316.
Neyrey v. Touro Infirmary, 94-0078, (La. App. 4 Cir. 6/30/94), 639 So.2d 1214, 1216.
Applied to this case the proper burden of proof renders a different outcome. The plaintiff proved without a doubt that the fall occurred and injury resulted from a foreign substance on the premises, i.e. the urine from the Foley catheter. Thus, the burden of proof shifted to the hospital to exculpate itself from the presumption of negligence that arises.
Since a floor slick due to liquid on it is unquestionably a dangerous condition, we must ask whether this dangerous condition could be reasonably anticipated in the hospital's activity. We find the answer to this question to be a resounding yes. Whenever there is a Foley catheter with tubes full of urine running along the floor, the fact that liquid may leak onto the floor is reasonably foreseeable. This leads us to our last query, did the hospital act reasonably in discovering and correcting the dangerous condition.
The record tells us that from the nurses' station the nurse could see one side of the *24 patient's bed. However, the Foley catheter was placed in a blind spot, on the side of the bed that the nurse could not see. The hospital records did not concur as to the time of the accident. On the one hand the nurse on duty testified that the accident occurred at 6:18 p.m., while the incident report stated that the time of occurrence of the accident was 6:40 p.m. The nurse testified that she checked Victoria Mosley's grandmother at 6pm, prior to being relieved of a 12-hour shift at 7pm. During the last visit of her shift, the nurse testified that she emptied the Foley catheter bag and noticed no urine on the floor. However, the nurse stated that it was not her job, nor among her responsibilities, to clean the floor.
While the nurse was finishing up her paperwork for the day and waiting to be relieved she testified that she was notified of the accident of Victoria Mosley. When she went to the aid of Ms. Mosley, she then noticed the liquid on the floor and the Foley catheter leaking. She did not know when the Foley catheter began leaking, she just knew that it was leaking when she entered the room after Victoria Mosley's accident.
One way to look at this particular set of facts is that had the Foley catheter been in view of the nurses' station, this accident may have been prevented. Another factor for consideration is that in general, a nurse who is making her last rounds visiting patients at the end of a twelve-hour workday is not going to be as alert as one who works a shorter shift. Thus, without questioning the credibility of the nurse's testimony, it cannot be disputed that a nurse at the end of a 12-hour work shift, is going to experience some fatigue, be it mental and/or physical and will not be as alert to notice liquid on the floor. Finally a third factor to consider is the amount of time that passed between the last room check and the accident is unknown, even though we know that Victoria's grandmother was being checked by the nurse every one to two hours. This particular set of facts calls into question the reasonableness of the hospital's procedures for discovery and correction of a dangerous condition. Thus, because we feel the hospital did not meet its burden of proof under these facts, we reverse the trial court, find the hospital liable to the plaintiff.

DAMAGES
Because of the aforementioned accident, and as a direct and proximate cause thereof, Victoria Mosley sustained an acute lumbosacral strain, an acute hip strain, and contusions to her hip, left foot, and left toe.
Immediately following her accident, Victoria Mosley was treated at the Methodist Hospital emergency room at no charge and was prescribed medication. Thereafter, she treated with Dr. Essam Elmorshidy, a Board Certified Orthopaedic Surgeon, from February 20, 1997 through October 16, 1997, at a cost of $710.00. On his initial examination of Victoria Mosley, Dr. Elmorshidy noted moderate spasms to her lumbar spine, decreased range of motion, a positive straight leg raising test of 45 degrees on the left and 60 degrees on the right, with decreased sensation and weakness of her left foot. The left knee showed swelling, as did her left foot. Dr. Elmorshidy ordered x-rays of Victoria's lumbar spine, which showed scoliosis due to spasms. He also ordered x-rays of Victoria's left knee, foot and hip. After his physical examination and review of the x-rays, Dr. Elmorshidy's impression on February 20, 1997 was that Victoria had sustained a lumbar strain, and strain and contusions to her left hip, left knee, and left foot. He prescribed massage with theragesic cream, parafon forte for pain, a lumbar corset, and ordered Victoria to avoid any strenuous activities.
Victoria returned to Dr. Elmorshidy's office on April 2, 1997, with back pain, left hip and left knee pain. Physical exam showed moderate spasms in her back, with decreased range of motion, a positive straight leg raising test at 40 degrees on the left and 50 degrees on the right. Victoria *25 returned to Dr. Elmorshidy again on May 8, 1997 with back and left knee pain. Physical exam showed spasms and decreased range of motion in her back, and a positive straight leg raising test at 50 degrees. She returned to Dr. Elmorshidy again on June 5, 1997 with back, left hip pain and left groin pain. Physical exam showed spasms in her back, with a positive straight leg raising test at 60 degrees.
On August 14, 1997, Victoria returned to the Doctor's office with back pain. Physical exam showed spasms and a positive straight leg raising test at 65 degrees. She returned to Dr. Elmorshidy again on October 16, 1997, doing "fairly well", and was finally discharged, some eight (8) months after her accident of February 13, 1997.
In summary, as a result of this accident the Mosleys' incurred seven hundred and ten dollars ($710.00) in medical bills.
We think in light of these facts, an award of general damages of seven thousand dollars ($7,000.00) in addition to the $710.00 in medical bills together with legal interest from the date of judicial demand until paid together with all cost is merited.
REVERSED AND RENDERED.