808 So.2d 771 (2002)
Maximillion HARVEY and Leroy Treadwell
v.
William COLE, Jr., Commercial Carriers, Inc., Illinois Insurance Company, Randolph Polk, Jr., and Clarendon National Insurance Company.
No. 2000-CA-1849.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 2002.
*775 Steven J. Rando, Glen A. Woods, The Law Offices of Steven J. Rando, L.L.C. and I. David Warner, III, New Orleans, LA, Counsel for Plaintiff/Appellee.
Jesse R. Adams, Jr., Shannon Howard-Duhon, Adams and Johnston, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY and Judge TERRI F. LOVE.
MICHAEL E. KIRBY, Judge.
Defendants, William Cole, Jr. and Commercial Carriers, Inc., appeal the trial court's judgment finding them liable to plaintiffs, Randolph Polk, Maximillion Harvey, Leroy Treadwell, and Murphy Clark, for damages arising from a December 15, 1995 vehicular collision.
In this appeal, the defendants argue that the jury erred in assigning 100% of the fault for this accident to Cole. They also argue that the jury erred in finding that the collision caused the injuries for which plaintiffs were awarded compensation. Finally, defendants claim that even assuming plaintiffs proved that they suffered injuries in the accident, the amount of damages awarded by the jury was excessive.

STATEMENT OF CASE
On December 15, 1995, a car driven by Randolph Polk and a commercial car carrier driven by William Cole collided on Chef Menteur Highway in New Orleans. Polk and his three passengers were proceeding west on Chef Menteur Highway in the far right lane. Cole was entering Chef Menteur Highway from a parking lot on the right side of the street. Other than these few undisputed facts, the parties offer completely differing versions as to how the accident occurred.
Plaintiffs assert that the Polk vehicle was traveling on the favored street within the posted speed limit, when the commercial car carrier came out of the Banner Chevrolet parking lot and struck the Polk vehicle with the ramp of its trailer. According to plaintiffs, the car carrier's trailer struck the front bumper of the Polk vehicle and the car carrier's ramp got entangled with the undercarriage of the Polk vehicle. Plaintiffs claim that their vehicle was lifted off of the ground by the ramp and dropped as the commercial carrier disengaged.
The defendants assert that Polk did not begin to stop soon enough after seeing the car carrier pull out of the parking lot. They claim that Polk ran into the car carrier even though he could have avoided it. Defendants maintain that this was a low-impact collision in which the Polk vehicle simply collided with the back end of the car carrier.

STANDARD OF REVIEW
The standard of appellate review of a trial court's findings of facts was enunciated in Mistich v. Volkswagen of Germany, Inc., 95-0939, pp. 4-5 (La.1/29/96), 666 So.2d 1073, 1077, as follows:

*776 It is a well settled principle that an appellate court may not set aside a trial court's finding of fact unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly wrong. Rosell, supra at 845; Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Arceneaux, supra at 1333. Where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra at 844. The reviewing court must always keep in mind that if a trier of fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La. 1990).
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable. Stobart, supra at 883; Theriot v. Lasseigne, 640 So.2d 1305 (La.1994). Moreover, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Sistler, supra, at 1111; Theriot, supra at 1313.

LIABILITY
The following testimony was presented on the issue of liability. Randolph Polk testified that he was driving his vehicle in the far right lane of Chef Menteur Highway toward Downman Road when the car carrier pulled out of the parking lot. He stated that he tried to stop and managed to do so very close to the car carrier. Polk stated that the car carrier continued its turn out of the parking lot, and the back end of the ramp of the car carrier "just kind of swept up under the bottom" of Polk's car, and lifted the front of the Polk vehicle up. He said the car carrier crossed three lanes of traffic on Chef Menteur Highway and was turning right into the left turning lane when one of Polk's passengers flagged down the driver of the car carrier to alert him of the collision. Polk testified that the car carrier was going "real fast" as it pulled out of the parking lot and into Chef Menteur Highway, but he could not estimate the actual speed. He reiterated that he was able to bring his vehicle to a complete stop after the car carrier entered his lane of Chef Menteur Highway, and that there was no contact between the two vehicles at the point when Polk stopped. He said the contact between the vehicles occurred when the car carrier continued to move across the lanes of traffic on Chef Menteur in his attempt to get into the far left turning lane.
Polk stated that he was approximately fifteen to twenty feet from the car carrier when he first saw it. He said there was a car behind him, but that car did not run into the car carrier.
*777 The other plaintiffs corroborated most of Polk' version of the accident. Leroy Treadwell also stated that the tail end of the car carrier went up under the Polk vehicle and picked it up, and continued onto Chef Menteur until it dropped the Polk vehicle. He went up to the driver of the car carrier while the light was red to stop him and let him know what had happened. He testified that the Polk vehicle stopped less than two feet from the car carrier as the car carrier was exiting the parking lot. Treadwell testified that his estimate of the car carrier's speed as it pulled out of the parking lot was three to five miles per hour.
Murphy Clark testified that the Polk vehicle was approximately ten feet from the car carrier when it started exiting the parking lot, and that the Polk vehicle was "within inches" of the truck when it came to a stop.
Maximillion Harvey testified that the Polk vehicle came to a stop as the car carrier was coming out of the parking lot, but the car carrier did not stop. Harvey said that two to three seconds later, the car carrier veered right and "the trailer came around, got up under us, shift up partways in another lane." He said the back end of the trailer came into contact with the Polk vehicle.
On the issue of liability, the defense presented two witnesses: William Cole, the driver of the car carrier, and Luther 0. Cox, Jr., an accident reconstruction expert hired by the defense. Cole testified that as he prepared to exit the Banner Chevrolet parking lot on the day of the accident, he waited for all the vehicles on Chef Menteur to pass before proceeding out into the street. When he pulled out, the only vehicle in his sight on Chef Menteur was in the left turn lane, waiting to turn left onto Downman Road. He said he remembered that the car in the turning lane was the same make and color of the Polk vehicle, but he could not say for sure that the vehicle in the turning lane was the Polk vehicle. He said he was traveling at a normal speed. When he got halfway through the turn out of the light, he had to start slowing down because of traffic that was backed up at the light at Chef Menteur and Downman. He had to come to a stop at a point when half of his truck was blocking the street. As he was stopped, someone came up to his door and told him that he had hit a car. Cole said that the type of tractor-trailer rig he was driving does not accelerate very quickly after being at a stop. He said it takes a "good while" to get this type of vehicle moving.
After being told that he had hit another vehicle, Cole got out of his truck and saw Randolph Polk talking on a cellular telephone. He asked the men in the Polk vehicle if they were all right, and then he noticed a scratch on the right front bumper of their car. He went back to move his truck and noticed green paint on the corner of the light assembly on the back of the truck. Cole said that Polk's vehicle was painted a greenish color. Cole testified that as he was driving out of the parking lot, he was turning slightly right onto Chef Menteur heading westbound, but he was also crossing the lanes of traffic in order to get into the far left turning lane so that he could get onto the westbound interstate highway. He said he did not feel any impact as he drove out of the lot, and that the first time he had any idea that anything had happened was when someone knocked on his truck door and said he had hit a car.
Cole testified that he brought the car carrier back to Banner Chevrolet later that day for an accident reconstruction. He was first asked to drive the truck the way he did at the time of the accident. He was then asked to drive the truck as fast *778 as he could all the way through the turn without slowing down for traffic. He insisted that he did not drive that way on the day of the accident. Both of these driving demonstrations were videotaped and the videotapes were played for the jury.
Cole did not dispute that his vehicle and the Polk vehicle collided on December 15, 1995. Cole admitted that he told his employer's claims adjuster that the accident occurred as Polk attempted to go around the tractor-trailer unit, which had nearly completed a right turn onto the roadway, and impacted the unit. He said that he did not see Polk's vehicle attempting to go around his car carrier, but he assumed that was what happened. He stated that there are some obstructions to seeing down Chef Menteur Highway as someone comes out of the Banner Chevrolet parking lot.
Luther O. Cox, Jr., a defense witness, was qualified as an expert in the field of accident investigation and reconstruction. He inspected both vehicles involved in the accident and considered the versions of the accident offered by both drivers. He arranged for Cole to be videotaped demonstrating how he exited the parking lot on the day of the accident. Based on his investigation, Cox concluded that no portion of the tractor-trailer rig could have come in contact with the right, front corner of the stopped automobile because the tractor-trailer was going away from that automobile. He said the only way that automobile could have struck that trailer is if that car was going faster than the tractor-trailer.
Cox inspected the Polk vehicle and found no indication that any repair work had been done on the front bumper. He also found no evidence of damage to the frame of the vehicle. He did find scratches on the right, front corner of the bumper. Cox estimated that it took between nine to ten seconds from the first motion of Cole's vehicle to the point where contact was made with the Polk vehicle in the right lane. He stated that Polk had those nine to ten seconds to stop his vehicle, assuming he was driving within the 40 miles per hour speed limit. Cox testified that assuming that the tractor-trailer rig took eight seconds to cross the far right traffic lane, Polk would have had an adequate distance to bring his vehicle to a stop 200 feet short of the trailer if he applied the brakes when the tractor-trailer rig first entered the right lane of traffic.
Cox testified that in his opinion, there is nothing to suggest that the Polk vehicle was thrown four feet in the air by the impact with the tractor-trailer rig. He said a vehicle that is lifted four feet in the air would have obvious visible damage to the bottom front bumper, which was not seen on the Polk vehicle. He said some scraping damage in front of the engine of the Polk vehicle could not have been caused by contact with the tractor-trailer because the heights of the two vehicles made contact impossible in the area where the scraping damage is present in the Polk vehicle.
Cox's opinion is that if contact occurred between the two vehicles, Polk must have been driving his car faster than the tractor-trailer rig was going away from him. He also opined that the tail of the tractor-trailer rig could not have swung out and struck the stopped Polk vehicle.
Cox stated that he did not generate a written report of his investigation. He admitted that he relied on Cole's testimony as to how he was driving to confirm his findings, but not to determine the physical performance of the vehicle. Cox stated that it was physically impossible for this accident to have occurred in the way that the plaintiffs described. He said he could *779 not physically prove that there was contact between the two vehicles. He said he assumed that Cole was right when he said there was contact between the right, front corner of the Polk vehicle and the left, rear light of the tractor-trailer rig. Cox admitted that Cole probably did not come to a complete stop when he reached the end of the parking lot. He also said he did not believe that Polk stopped his vehicle before the impact.
Thomas McNish testified for the defense in the field of injury-causation analysis. His opinion was that the biomechanical forces of this accident could not have caused the injuries claimed by Polk and Harvey, even assuming that the accident occurred exactly as they described. McNish did not offer an injury-causation analysis for Treadwell or Clark.
The jury in this case obviously found the plaintiffs to be credible witnesses. The jury must have disbelieved William Cole's version of the accident, which was at times conflicting. The testimony of the accident reconstruction expert, Luther Cox, was based, in part, on information provided to him by Cole. The jury evidently rejected Cox's opinion that the accident could not have occurred as plaintiffs testified. The jury also evidently rejected Thomas McNish's opinion that the biomechanical forces applied to Polk's and Harvey's bodies in the accident could not have caused the injuries complained of by these plaintiffs.
The jury was in the best position to evaluate the credibility of the witnesses. We do not find that their credibility determinations on the liability issue were unreasonable. Therefore, we will not disturb the jury's finding that Cole was solely at fault for this accident.

CAUSATION
The defense argues that the jury erred in finding that the accident at issue caused the injuries for which the plaintiffs were awarded compensation. The plaintiff's burden of proof of causation in a personal injury case was set forth by our Supreme Court in Maranto v. Good-year Tire & Rubber Co., 94-2603, p. 3 (La.2/20/95), 650 So.2d 757, 759, as follows:
In a personal injury suit, plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. American Motorist Insurance Co. v. American Rent-All, Inc., 579 So.2d 429 (La.1991); Aucoin v. State Farm Mut. Auto. Ins. Co., 505 So.2d 993 (La.App. 3d Cir.1987); Richard v. Walgreen's Louisiana Co., 476 So.2d 1150 (La.App. 3d Cir.1985). Plaintiff must prove causation by a preponderance of the evidence. Morris v. Orleans Parish School Bd., 553 So.2d 427 (La.1989). The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Mart v. Hill, 505 So.2d 1120 (La.1987); Villavaso v. State Farm Mut. Auto. Ins. Co., 424 So.2d 536 (La.App. 4th Cir.1982).
Plaintiff Randolph Polk offered the testimony of Drs. Kenneth Vogel and Robert Shackleton on the issue of causation. Dr. Vogel is a neurosurgeon who first treated Polk on March 21, 1996. He ordered lumbar and cervical MRIs. Dr. Vogel's diagnosis was that Polk had a herniated lumbar disc. Dr. Vogel performed a posterior lumbar interbody cage fusion on Polk in September 1998. Dr. Vogel stated that Polk incurred a 15 to 20 percent permanent total body disability and he advised Polk to avoid lifting, pushing or pulling greater than 35 pounds on a permanent basis. He testified that the surgery, *780 disability and related medical expenses incurred were related to the December 15, 1995 accident.
Dr. Vogel also testified that Polk's cervical MRI showed multiple abnormalities, including a herniated disc. His opinion was that the neck should be treated conservatively, but if the pain becomes intractable, Polk will need to have anterior cervical fusion surgery. He could not say that it was more probable than not that Polk will need this cervical fusion surgery; he would only say that Polk is a candidate for this surgery if the pain gets worse and that this could happen spontaneously without another injury. Dr. Vogel said that the need for future neck surgery and the cost of that surgery, $25,000.00 to $30,000.00, are the result of the December 15, 1995 accident.
Dr. Robert Shackleton, an orthopedic surgeon, said that an MRI of Polk's right leg revealed a torn lateral meniscus in the right knee. Dr. Shackleton said that it is a reasonable medical possibility that the complaints Polk had with his right knee are related to the accident of December 15, 1995. He said that arthroscopic surgery can be performed to repair a tear of the meniscus in the knee. However, Dr. Shackleton did not state at any time in his testimony that he recommended that Polk have this knee surgery in the future.
The defense presented the testimony of Dr. Monroe Laborde, an orthopedic surgeon that performed an independent medical examination of Polk on March 30, 1998. His opinion was that Polk's physical condition was not related to the December 15, 1995 accident, but was due to the aging process. He also concluded that Polk's pain was most likely related to psychological factors and not the automobile accident.
Based on the medical testimony presented, we find that Polk established that his back, neck and knee injuries were caused by the December 15, 1995 accident. He also established that his back surgery was related to the accident. However, he did not establish that any future neck or knee surgery is related to the accident. Dr. Vogel's testimony regarding the need for future neck surgery is speculative and does not establish with legal certainty that this surgery will be required. See, Jones v. Sampey Bros. General Const., Ltd., 544 So.2d 1192 (La.App. 5 Cir.1989). Similarly, Dr. Shackleton's testimony did not establish that future knee surgery would be required.
On the issue of causation, plaintiff Maximillion Harvey presented the testimony of Dr. Toussaint Leclercq, a neurosurgeon. Dr. Leclercq saw Harvey on April 22, 1996 and ordered an MRI of the cervical spine. The MRI showed that Harvey had a herniated disc on the left side at the C6-C7 level. Because of persistent pain in his neck and left shoulder and arm, Harvey was offered the option of surgery, which he accepted. Dr. Leclercq performed anterior cervical fusion surgery on Harvey on August 8, 1996. He stated that the injury and surgery have resulted in a 10 to 15 percent total body disability for Harvey. Dr. Leclercq stated that the cause of the Harvey's surgery, the resulting medical bills and the 10 to 15 percent total body disability were caused by the December 15, 1995 accident.
The defense presented the testimony of Dr. Monroe Laborde, an orthopedic surgeon that performed an independent medical examination of Harvey on March 23, 1998. Dr. Laborde's opinion was that there was no objective evidence of a connection between Harvey's physical condition and the accident. He said an MRI taken on March 18, 1996 did not show a change from an injury, but it showed *781 changes from the aging process. Dr. Laborde also said that Harvey did not have any condition in his neck that required surgery.
Based on the testimony presented, Harvey sufficiently established that his injuries and surgery were related to the accident.
Plaintiff Leroy Treadwell offered his medical records and reports from the American Medical Group, Inc. In his report, Dr. Earl L. Stewart stated that Treadwell suffered lumbar strain, secondary to the motor vehicle accident of December 15, 1995. Although Dr. Stewart did not testify at trial, his report is sufficient to establish that Treadwell's lumbar strain was caused by the accident at issue. Treadwell's medical records also include an April 9, 1996 report from Dr. Lander Pearce, a radiologist who reviewed an MRI of Treadwell's cervical spine. In that report, Dr. Pearce noted herniated discs at three levels of Treadwell's cervical spine. However, nothing in Dr. Pearce's report relates the herniated discs in the cervical spine to the December 15, 1995 accident. Dr. Pearce testified at trial that she could not say whether the herniated discs were the result of trauma or the degenerative process. Therefore, because there was no medical evidence relating Treadwell's herniated discs to the December 15, 1995 accident, we find that Treadwell did not establish that the herniated discs in the cervical spine were caused by the December 15, 1995 accident.
Plaintiff Murphy Clark also offered his medical records and reports instead of live medical testimony. Dr. I.D. Brickman wrote in his report that Clark suffered lumbar strain, secondary to the motor vehicle accident of December 15, 1995. This evidence is sufficient to establish that Clark suffered lumbar strain in the accident.

DAMAGES
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), our Supreme Court set forth the standard of review of general damage awards as follows:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979) ] to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
While we must defer to the great, even vast discretion of the trier of fact in the assessment of general damages, the manifest error standard controls on the issue of the assessment of special damages. Johnson v. State Through Department of Public Safety and Corrections, 95-0003 (La. App. 1 Cir. 10/6/95), 671 So.2d 454.
Plaintiff Randolph Polk was awarded total damages of $2,075,858.00. Included in that amount were awards of $500,000.00 for past pain, suffering and *782 mental anguish, $500,000.00 for future pain, suffering and mental anguish, $232,000.00 for past loss of income, $750,000.00 for future loss of income/earning capacity, $53,858.00 for past medical expenses, and $40,000.00 for future medical expenses.
As stated above, Polk established that his back, neck and knee injuries were caused by the December 15, 1995 accident. Polk underwent lumbar fusion surgery and has incurred a 15 to 20 percent permanent total body disability as a result of his injuries and surgery. He also sustained a cervical herniated disc and a torn lateral meniscus in the right knee. Although Polk did not establish with legal certainty that he would require future neck or knee surgery, the award of $40,000.00 for future medical expenses did not specify that this amount included the costs of future surgery. Considering the serious nature of Polk's injuries and his past medical expenses, we find that the award of $40,000.00 is appropriate for future medical expenses, even without future surgery.
The record supports the award to Polk for past medical expenses. As for the awards for general damages, Polk presented his own testimony along with the testimony of his treating physicians, a vocational rehabilitation counselor and an economist. The defense presented the testimony of a physician, a vocational rehabilitation counselor and an economist, who all offered opinions that conflicted with the opinions offered by Polk's witnesses. After considering the evidence presented, we find that the awards for general damage awards, although very high, are not so excessive as to constitute an abuse of the great, even vast, discretion afforded to the trier of fact in the assessment of general damages.
Plaintiff Maximillion Harvey was awarded total damages of $402,756.00. Of that amount, $175,000.00 was awarded for past pain, suffering and mental anguish, $125,000.00 for future pain, suffering and mental anguish, $30,000.00 for past loss of income, $32,756.00 for past medical expenses, and $40,000.00 for future medical expenses.
Harvey underwent cervical fusion surgery as a result of injuries sustained in the accident. His neurosurgeon, Dr. Leclercq, stated that the injuries and surgery have resulted in a 10 to 15 percent total body disability for Harvey. Given the testimony of Harvey, his treating physician, and documentary evidence regarding Harvey's income, we cannot say that the general damage awards were an abuse of the great, even vast, discretion of the trier of fact. Harvey's medical records support the award for past medical expenses. Considering the serious nature of Harvey's injuries and his total body disability resulting from his injuries and surgery, as well as his past medical expenses, we find no error in the award of $40,000.00 in future medical expenses.
Plaintiff Leroy Treadwell was awarded total damages of $344,105.00. Included in that amount were awards of $125,000.00 for past pain, suffering and mental anguish, $200,000.00 for future pain, suffering and mental anguish, $16,000.00 for past loss of income and $3,105.00 for past medical expenses. As stated above, Treadwell established that he suffered lumbar strain in the December 15, 1995 accident. However, Treadwell did not establish through medical testimony that the herniated discs in his cervical spine were related to the December 15, 1995 accident. Accordingly, the general damage awards for pain, suffering and mental anguish will be reduced from $325,000.00 to $15,000.00 for pain, suffering and mental anguish related to the lumbar strain. The evidence in the record *783 supports the awards to Treadwell for past loss of income and past medical expenses.
Plaintiff Murphy Clark was awarded total damages of $22,885.00. Of that amount, $10,000.00 was awarded for past pain, suffering and mental anguish, $5,000.00 for future pain, suffering and mental anguish, $6,000.00 for past loss of income, and $1,885.00 for past medical expenses. Clark established that he suffered lumbar strain in the accident. We find no abuse of discretion in his awards for general damages and no manifest error in his awards for special damages.
For the foregoing reasons, we amend the trial court's judgment to reduce the award in favor of plaintiff Leroy Treadwell from $344,105.00 to $34,105.00. In all other respects, the trial court's judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
LOVE, J., concurs with reasons.
LOVE, Judge, concurring.
The majority states that it reduced the jury award because Dr. Pearce's report did not relate the herniated discs in the cervical spine to the December 15, 1995 accident. Dr. Pearce performed the MRI; however, as Dr. Pearce testified, Dr. Brickman, as the clinician in this case, was the appropriate person to relate the injury to the accident in question. Nonetheless, the record is devoid of any evidence linking the injury to the accident. Consequently, Plaintiff's jury award was appropriately reduced.