LMAX N. TOBIAS, JR., Judge.
This case involves personal injury claims brought by three plaintiffs who were injured when acoustical ceiling tiles fell on them in a doctor’s office.
On 3 June 1998, Kim Wattigney and Cheryl Moore were working in the medical office of Dr. Dion L. Armstrong d/b/a Armstrong Family Clinic (“Dr.Armstrong”). Henry Martin, a patient of Dr. Armstrong’s, arrived for an appointment that morning and was escorted to an examination room by Ms. Mooi’e. Because the office had been experiencing water intrusion through the ceiling for a couple of months, Ms. Moore and Ms. Wattigney had arrived at work early to mop up any water on the floor and place towels around the baseboards in an attempt to keep the floor as dry as possible. They also placed fans in the area of the leaks to dry the floor. In their efforts to clean up the water, Ms. Moore and Ms. Wattigney had to move some office furniture in the area of the leak, which blocked the usual ingress to the examination area of the office. As a consequence, Ms. Moore escorted Mr. Martin through Dr. Armstrong’s office at the time of his appointment. As they were progressing down a hall toward the examination room, they entered the area of the leaks when the ceiling suddenly gave way, causing acoustical ceiling tiles to fall on Mr. Martin and Ms. Moore, knocking them to the | ground. Ms. Wattigney, who was tending to a hot wax machine used in therapy by the office, was also knocked down when Ms. Moore fell into her and spilled hot wax down her side; she sustained burns to her side and leg.
Dr. Armstrong’s office had been dealing with the water intrusion, which was caused by a leaking air conditioning unit in the ceiling, for about two months. During that time, Dr. Armstrong and his staff complained numerous times to the owner of the building, Kailas Management, L.L.C. (“Kailas”), and had asked that the air conditioning unit be repaired. Ms. Moore complained by telephone to Kailas’ office manager on 15 April 1998 and again just five days before the accident. Ms. Wattigney complained to Kailas at least five times during the month before the accident. Dr. Armstrong himself wrote two letters to Kailas asking that the problem be fixed. In his letter to Kailas dated 1 June 1998, Dr. Armstrong complained that he had been reporting the problem to Kai-las since the beginning of May 1998 and that water was leaking through the ceiling to the point that “ceiling tiles have busted through.” He further stated that “[t]his is a very serious hazard in that: 1. Spilled water can cause patients to slip and fall....”
The testimony at trial established that Kailas had received complaints from Dr. Armstrong’s office regarding the leaking air conditioning unit, although the policy regarding recording maintenance com *887 plaints by tenants was never consistently followed. Kailas apparently did dispatch on at least a couple of occasions the building handymen, who attempted to fix the unit, but who were obviously not qualified to either diagnose or remedy the problem. Kailas did not have an established inspection procedure for the units or a service contract with any contractor. A licensed air conditioner repairman was eventually called after the accident occurred and the unit was fixed.
|3The plaintiffs filed suit against Kailas and its liability insurer, Colony Insurance Company (“Colony”), who in turn filed a third party demand against Dr. Armstrong and his insurer on 3 November 1998. Kai-las and Colony asserted that Dr. Armstrong, who was clearly aware of the leak and the dangers it posed, bore some liability for failing to protect his patients from the danger. Kailas and Colony further maintained that the plaintiffs, Ms. Wattig-ney and Ms. Moore, were also aware of the leak and that their knowledge of the leak should make them contributorily at fault and reduce their damages.
The matter was tried before a jury in September 2002. The jury returned a verdict in favor of the plaintiffs, found Kailas to be 90% at fault for the plaintiffs’ damages, and found Dr. Armstrong at fault for the remaining 10% of the damages. Mr. Martin was awarded $600,000.00 for pain and suffering; $200,000.00 for mental anguish; $60,000.00 in past medical damages; $70,000.00 in future medical damages; $12,000.00 in past lost earnings; and $30,000.00 in future lost earnings. Ms. Moore was awarded $75,000.00 for pain and suffering and $6,142.00 in past medical damages. Ms. Wattigney was awarded $20,000.00 for pain and suffering; $3,223.00 in past medical damages; and $125.00 in past lost earnings.
On appeal, the appellants, Kailas and Colony, assign six errors to the trial court. First, they argue that the jury erred in assigning only 10% of the fault to Dr. Armstrong. Next, they assert that the general damage award to Mr. Martin of $800,000.00 was an abuse of discretion and that the past and future lost wage awards are not supported by the evidence at trial. They also take issue with the award of future medical damages to Mr. Martin on the grounds that they are not supported by any objective evidence at trial. Finally, they assert that the general damage award to Ms. Moore is excessive in light of her injuries and that both she Land Ms. Wat-tigney should have their awards reduced by a percentage of fault as they also knew of the dangerous condition prior to the accident and are comparatively at fault.
The plaintiffs, collectively and individually, assign three errors to the trial court. First, they contend that the trial court erred in assigning any degree of fault to Dr. Armstrong. Second, Ms. Moore asserts that the trial court erred in awarding her only $75,000.00 in general damages, with no award for future medical expenses. Finally, Ms. Wattigney asserts that the trial court erred in awarding her only $20,000.00 in general damages.
1. Fault of Dr. Armstrong:
Kailas and Colony argue that the court erred in only finding Dr. Armstrong 10% at fault for the accident, while the plaintiffs argue that Dr. Armstrong should not have been held liable for any fault, as the injuries sustained by the plaintiffs were caused solely by the negligence of Kailas.
A trier of fact’s apportionment of fault may not be overturned by an appellate court, even if an appellate court would have apportioned fault differently, unless it is found to be manifestly erroneous or *888 clearly wrong. Dupree v. City of New Orleans, 99-3651 (La.8/31/00), 765 So.2d 1002.
Kailas and Colony argue that Dr. Armstrong had actual knowledge of the leaking air conditioner unit and the dangerous condition it presented to both his staff and his patients and that he breached his duty to protect them from the known hazard. In fact, Kailas views the letter written by Dr. Armstrong on 1 June 1998 as an admission of fault.
The plaintiffs argue that the maintenance of the air conditioning unit was not the responsibility of Dr. Armstrong and that both the status as a tenant under J^Louisiana law and the terms of the lease agreement hold Kailas, as lessor, fully responsible for the damages caused by the faulty air conditioner. The lease agreement in effect on 5 June 1998, signed both by Dr. Armstrong and Gowri S. Kailas on behalf of Kailas Management, L.L.C., provides, in pertinent part, the following:

MAINTENANCE:

[[Image here]]
(c) The Tenant shall give the Landlord prompt notice of any needed repairs to plumbing, heating or air conditioning, or electrical lines located in, servicing or passing through the Leased Premises. Following the notice, the Landlord shall make the appropriate repairs with due diligence and at its expense, unless the repairs were necessitated by damage or injury attributable to the Tenant, its servants, agents, employees, invitees or licensees. In that event, the Tenant shall bear the expense of the repairs.
[[Image here]]
It is clear from a reading of the lease agreement, and this provision in particular, that Dr. Armstrong’s duty with regard to the broken air conditioning unit was to notify Kailas and that Kailas, as lessor, contractually accepted responsibility to repair the unit with due diligence. The evidence in the record makes it clear that Dr. Armstrong fulfilled his duty under the lease by notifying Kailas several times, both by phone, which Kailas employee Tina Kovacks testified was the procedure established by Kailas, and later by correspondence, when no effort was made by Kailas to remedy the situation.[1]
| ^However, as Kailas and Colony point out, Dr. Armstrong’s duty to take further action may not be rooted in the lease agreement, but rather in Louisiana tort law. They point to the factors outlined in Watson v. State Farm Fire Cas. Ins. Co., 469 So.2d 967 (La.1985) where our Supreme Court has held that which may influence the apportionment of fault assigned by a trier of fact. These influences include (1) the awareness of the danger; (2) how great a risk was created by the conduct in question; (3) the significance of what was being sought by the conduct in question; (4) the relative capacities of the actors; and (5) any extenuating circumstances. In this case, Kailas and Colony assert, Dr. Armstrong clearly knew of the dangers posed by the leaking unit, as evidenced by the letters written to Kailas prior to the accident, and even described the leaking ceiling as a very serious hazard. Further, although he did not have the primary responsibility of maintaining the air conditioning unit in his office, he *889 had the option and legal right to call an air conditioning repair contractor and deduct the cost of the repair from the monthly rent he paid Kailas.[2]
Kailas and Colony pursue their point further by suggesting that Dr. Armstrong had a greater duty than Kailas to guard the plaintiffs against harm from the leaking unit under a theory of privity; that is, his duty to the invitees in his office was a stronger duty than the duty of Kailas as building owner. Kailas and its 17insurer cite Billups v. Lyons, 2001-1654, 2001-1655 (La.App. 4 Cir. 5/29/02), 821 So.2d 499 and Arbon v. Charbonnet, D.D.S., 99-852 (La.App. 5 Cir. 1/25/00), 761 So.2d 20, in support of their position that Dr. Armstrong should be held liable for at least 50% of the damages caused by the falling ceiling tiles.
In Billups, the plaintiff brought an action in redhibition shortly after purchasing a termite-infested home from the Lyonses, who were named as defendants in the action. The Lyonses brought a third party action against their termite contractor, which had conducted an inspection prior to the sale and which certified that there was no evidence of termite infestation. The termite contractor had sent an unlicensed employee to inspect the property, although the certificate of compliance required by the mortgage company was signed by a licensed termite inspector also employed by the contractor. This court noted that although the sellers of the property were at fault for failing to disclose the termite damage, the termite inspector “owed a heightened degree of responsibility” to the purchaser, insofar as he was fully aware of the effect of the termite inspection on the sale and the financing options of the purchaser.
Although Kailas and Colony submit that Dr. Armstrong had a similar “heightened degree of responsibility” to his employees and patients, the holding in Billups is not applicable to the case sub judice. In Bill-ups, the termite inspector was found to have been in the best position to know of the termite infestation and further was found to have misled both the buyer and sellers with a false certificate [8and by failing to disclose that an unlicensed employee had actually made the inspection.
In Arbon, an orthodontist who owned a building was sued by his tenants who rented office space below his office after a pipe in his office burst, causing a water leak that damaged the plaintiffs’ office spaces. The leak was caused by a solenoid valve improperly used as a safety shut-off that was sold and installed by a dental supply company. The solenoid valve was found to have been installed in an improper manner, with the water filter downstream from the valve. Although the trial court dismissed the supplier of the valve because it did not design the valve and therefore could not be held liable for a faulty design, the court of appeal reversed, and found that “by installing the system in a manner contrary to the accompanying instructions and warnings and without notifying Dr. Charbonnet of the problem, it inserted itself into the equation of fault when the *890 system malfunctioned....” Id. at 10-11, 761 So.2d at 26. Kailas and Colony argue that Dr. Armstrong similarly inserted himself into the “equation of fault” by failing to remedy the leaking air conditioning system. Thus, although Kailas had a contractual duty (as well as a duty under La. C.C. arts. 2822 and 2692 et seq.) to remedy the known defect in the property before anyone was injured, Dr. Armstrong also had a duty, under a duty-risk analysis, to protect the licensees and invitees at his office from what he perceived as a very serious hazard. See, Foggin v. General Guaranty Ins. Co., 250 La. 347, 195 So.2d 636 (1967); Mosley v. Methodist Health System Foundation, Inc., 99-3116, p. 3 (La.App. 4 Cir. 11/15/00), 776 So.2d 21, 23. We do, however, find that Kailas had the greater duty to act and that that failure to act was a greater breach than any committed by Dr. Armstrong, who did himself and through his employees contact Kailas repeatedly |flto make the necessary repairs and who did not just ignore the problem. Therefore, we find no manifest error in the apportionment of fault made by the jury.
2.GeneraI Damage Award to Mr. Martin
Kailas and Colony next assert that the jury abused its discretion in awarding $800,000.00 in general damages to Mr. Martin to compensate him for a cervical spine injury. An award for damages must be reviewed in a light most favorable to the party who prevailed at trial. Harvey v. State, Dept. of Transportation and Development, 2000-1877, p. 10 (La.App. 4 Cir. 9/26/01), 799 So.2d 569, 576, writ denied, 2002-0003 (La.3/15/02), 811 So.2d 910. An appellate court may not overturn an award for damages unless it is so out of proportion to the injury, complained of that it shocks the conscience. Id. at 11, 799 So.2d at 577. In fact, the fact-finder has vast discretion in determining a general damages award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
Mr. Martin was a 50-year-old veteran of the Viet Nam war at the time of this accident. While in Viet Nam, he sustained gunshot wounds and underwent surgery to his right forearm and lower back. He spent 35 months in hospitals following his injuries and, in 1973, determined that he could no longer meet the physical demands of active duty with the Marine Corps. Mr. Martin received an honorable medical discharge in 1974 and the Veterans’ Administration (“VA”) assigned him a 50% disability rating. Following his discharge, he worked at the VA hospital in housekeeping and became a nurse’s aide in a psychiatric hospital. Because the job involved lifting patients, residual pain from his war injuries compelled him to resign. In 1976, he received a 40% disability pension. In 1982, Mr. Martin moved to New Orleans to live with his brother and work as a handyman, picking up odd jobs, and working approximately five hours per day. He subsequently worked Imdeaning and painting apartments in the apartment complex in which he resided, and washing cars on the weekend. Although he had received a disability rating from the VA during these years, Mr. Martin testified that a veteran is allowed to make a certain amount of money by working and still receive disability benefits from the VA.
Mr. Martin’s more recent medical history revealed a slip and fall accident in his kitchen in which he injured his left elbow and lower back for which surgery was never recommended. Mr. Martin points out that at no time prior to the accident at issue in this litigation did Mr. Martin ever receive treatment for any injury to his neck.
*891 Mr. Martin began treating with Dr. Armstrong in 1995 for pain management resulting from the fall in his home. He treated a total of seventeen times with Dr. Armstrong prior to the subject accident. Dr. Armstrong prescribed Lortabs and Soma for pain on 5 May 1998. On every visit to Dr. Armstrong prior to June 1998, Mr. Martin had rated his pain level as ten out of ten, indicating that he was experiencing significant pain from his prior injuries.
Dr. Edward H. Shwery,[3] a clinical psychologist, began treating Mr. Martin on or about 8 June 1999, for chronic pain, depression, and anxiety. Dr. Shwery testified that he interviewed Mr. Martin regarding his symptoms and that he reviewed his medical records from the VA. Dr. Shwery testified that he was aware of Mr. Martin’s past history of post-traumatic stress disorder. He stated that it was not Mr. Martin’s post-traumatic stress disorder that was causing his anxiety, depression, sleep problems, and sexual dysfunction. He testified that Mr. Martin will need individual counseling for three years and another two years of pain | nmanagement, at a cost of $70,000.00 (hence the award for future medical damages, discussed infra.)
Kailas and Colony argue that the only injury sustained by Mr. Martin was a cervical injury that necessitated a two level fusion. Further, although they acknowledge the long-standing premise that a tort-feasor takes his victim as he finds him, they assert that that legal rule does not apply to the facts of this case. It is uncontested that Mr. Martin has never sustained a neck injury prior to this accident, and there is no contention that any of his previous physical ailments were exacerbated or aggravated by the subject incident. Further, Kailas and Colony make much of the contention that Mr. Martin was a mental and physical wreck before the accident in question, and therefore the pain and suffering he endured as a result of the neck injury must pale in comparison to the pain and discomfort he had been experiencing for some time; that is, Mr. Martin’s quality of life was demonstrably poor according to his own testimony and medical records. They reason that this injury could not have had a very dramatic effect on his life or lifestyle.[4] We find this particular argument specious and note that no legal authority is cited in support of it.
Mr. Martin contends, however, that the award is neither excessive nor unreasonable. He views his past medical history as leaving him particularly vulnerable to this injury and argues that given his previous disability status, this injury has essentially deprived him of the few activities and pleasures he could enjoy prior to the accident. He notes that he has suffered from depression, extreme h?pain in his neck, and sexual dysfunction as a result of this injury, and that the few small jobs he could previously do to earn money he can no longer perform. Mr. Martin cites a number of cases with similarly high awards, but we note that the cases he cites often involve multiple injuries.[5]
*892 Kailas and Colony likewise cite a number of eases they feel offer guidance to a proper award in this case.[6] Interestingly, both Kailas and Colony on one hand and Mr. Martin on the other cite the case of Harvey v. Cole, 2000-1849 (La.App. 4 Cir. 1/28/02), 808 So.2d 771, each party referencing awards to different plaintiffs in that case. Mr. Martin points to the general damage award of $1,000,000.00 to one plaintiff for a cervical herniated disc and torn lateral meniscus, as well as an injury to his back requiring lumbar fusion surgery, while Appellants point to the award to another plaintiff in the same case whose neck injuries required an anterior cervical fusion similar to the one Mr. Martin underwent, and who was awarded $300,000.00.
Given that the physical and psychological injuries caused by the incident, we do not find that an award of $800,000.00 shocks the conscience such that it cannot be sustained as a matter of law. Although the award is high on the quantum scale, and if we were sitting as the trier of fact might have awarded a somewhat lesser amount, we do not find that the jurors exceeded their vast discretion by their award. We acknowledge that Mr. Martin has experienced significant pain and [ 7Sanguish and do not wish to minimize his experience. We cannot say to a certainty within our constitutional mandate to review the law and the facts from the record that the jury in this matter attempted to award Mr. Martin for conditions/ailments that were not caused by the conduct of Kailas. While we reject the argument that his fragile health prior to the accident should serve to diminish what a healthy person might be awarded for pain and suffering for the same injury, we agree that the defendants/appellants should not bear the cost of compensating Mr. Martin for injuries that pre-dated the accident in question. Therefore we affirm the award of $800,000.00 for pain, suffering, and mental anguish.
B.The award to Mr. Martin for future medical expenses.
Kailas and Colony contest the award to Mr. Martin for future medical expenses on the grounds that much of the future medical treatment, especially the palliative measures, that he will need was needed prior to the accident in question. As such, they contend that they should not be held liable for the full extent of his future medical treatment. They note that the only basis for a future medical expense award is the testimony of Dr. Shwery, who opined that Mr. Martin would require pain management and treatment for a six-year period, totaling approximately $70,000.00. Further, they argue that even Dr. Shwery could not quantify the amount and offered little explanation for the figure.
Any computation of a future medical damage award is by its nature a creature of speculation. Therefore, all a finder of fact is able to do is use the testimony and evidence presented at trial to determine, to the extent that it can be determined, what the costs for future medical treatment might be for a complainedjofj4 injury. Dr. Shwery did not link Mr. Martin’s pain, anxiety, and depression to the pre-existing post-traumatic stress disor *893 der, but rather to pain from the neck injury. Although experts may disagree as to the exact source of his pain and mental trauma, especially in light of his complicated medical and psychological history, we do not find that the jury was manifestly erroneous or clearly wrong in relying on Dr. Shwery’s testimony and awarding $70,000.00 in future medicals.
4.The award to Mr. Martin for lost earnings.
Kailas and Colony take issue with the award of $12,000.00 for past lost earnings and $30,000.00 for future lost earnings to Mr. Martin on the grounds that he applied for full disability benefits from the VA prior to the accident and who was declared 100 disabled by the VA for reasons having nothing to do with this accident. We agree.
Mr. Martin has not had steady employment since the 1970s, when he had to leave his employ at the psychiatric hospital due to health considerations. He testified that he worked four or five hours per day with his brother during the 1980s, performing handyman work and odd jobs. During the 1990s, Mr. Martin testified that he cleaned out and painted vacant apartments in his apartment complex and that he did maybe two a month. Further, he testified that he washed ears on some weekends, but did not specify how many cars he washed or how often he was able to perform this work. Randolph Rice, Ph.D., an economist, testified at trial that he would estimate that Mr. Martin had lost wages of approximately $28,596.00 and that he would lose $55,997.00 in future wages as a result of his neck injury. He based these figures on the assumption that Mr. Martin would have otherwise worked four or five hours per day at minimum wage. There |inis nothing in the record except for Mr. Martin’s testimony to support this assumption.
What is more striking in this case is not the amount of the lost wage award, but the fact that one was made. Mr. Martin received his first disability rating of 40, later raised to 50, in 1974. He applied for an increase in his disability pension and began receiving full benefits on or about 26 January 1998, several months prior to the incident in question. His disability rating was based upon his assertion and a showing that he was not able to work at all. Records from the VA indicate that if Mr. Martin was working at all prior to the June 1998 accident, the VA was completely unaware of it. He was examined on 11 June 1998 for an evaluation of his post-traumatic stress disorder by the VA and the examiner made the following report: The patient has not worked since 1974. He says that he was 50 service connected until 1990 and has been 100 since 1990. Further, although Mr. Martin offered general testimony regarding his recent work history, he did not substantiate his testimony with any documentation. Although he contends that a veteran is allowed to work to make extra money while on full disability, we can surmise that he did not report any of his earnings income to the VA or to the Internal Revenue Service, further eroding his claim for lost wages.
Mr. Martin counters that a plaintiff may establish a lost wage claim on the basis of his testimony alone and that a lost future earnings award is not meant to compensate for actual lost work in the future, but for the loss of the ability to earn wages in the future as a result of an accident. See, Carter v. Baham, 95-2126 (La.App. 4 Cir. 10/9/96), 683 So.2d 299, 307, citing Folse v. Fakouri, 371 So.2d 1120, 1123 (La.1979). We agree with this assessment of the law. However, what is problematic with Mr. Martin’s claim for lost wages, both past *894 and future, is that the 1 ^evidence preponderates to show that he was not able to work prior to this accident and further, that he would not be able to work in the future, even if he had not been injured on that fateful day in June 1998. At least, that appears to be what Mr. Martin represented to the VA. We find that, given these particular and unusual circumstances, an award for lost wages, past and future, is an abuse of discretion. Therefore, we reverse the award of $12,000.00 for past-lost earnings and $30,000.00 for future lost earnings to Mr. Martin.
5. The general damage award to Ms. Moore.
Kailas and Colony assert that the $75,000.00 general damages award to Ms. Moore is excessive given that her only complained-of injury is a soft tissue injury. As we have noted above, a trial courts discretion in determining an award for general damages is vast and an award should not be disturbed unless it shocks the conscience. See, Harvey v. Cole, supra.
When the ceiling tiles fell on Ms. Moore, she fell to the ground, landing on her .buttocks, and striking her head on the floor. She suffered from blurred vision, dizziness, ringing in her ears, tingling in her arms, and burning in her legs later that night. The dizziness and ringing in her ears persisted for a couple of months. Ms. Moore treated with a chiropractor for a soft tissue injury at the Spine Soft Tissue Center, but did not find any relief for her back pain. She subsequently began treatment with James J. Mulvey, M.D., a specialist in emergency medicine. He diagnosed cervical and lumbar strains, and she was treated with medication and therapy. Because Ms. Moore’s symptoms persisted longer than anticipated by Dr. Mul-vey, he ordered neck and lower back MRIs, which revealed what the physician _Jjjperforming the MRI diagnosed as either haemangioma[7] or a compression fracture at the LI vertebra. Dr. Mulvey indicated that he suspected a compression fracture based upon Ms. Moore’s complaints of pain. He ordered a further MRI and a bone scan, but neither diagnostic procedure was performed.
Kailas and Colony assert that absent any type of further confirmation of Ms. Moore’s condition, Dr. Mulvey’s conclusion that she sustained a compression fracture is merely supposition and not sufficient to establish by a preponderance of the evidence that she indeed did sustain a compression fracture in the accident. They further argue that Ms. Moore’s complaints of back pain, which apparently led Dr. Mulvey to determine that she had a compression fracture, are simply not credible, and that the jury committed manifest error in believing her testimony.
Kailas and Colony point to Ms. Moore’s medical records relating to a subsequent accident and note that she was examined by another orthopedist, J.O. Trice, M.D., in May 1999, and given a full orthopedic evaluation. His notes reflect no complaints of back pain and that the orthopedic evaluation performed at that time revealed no low back radicu-lopathy, spasmophilia, or lumbar disc herniation. Further, they note that Dr. Trice treated her once a month until October 1999 and that there is no indication that she ever told him about any back pain, while she was complaining of back pain to Dr. Mulvey during the same time period. As such, Kailas and Colony argue that her testimony is not credible *895 and that general damages should be limited to treatment of a soft-tissue injury and suggest $20,000.00 as a more appropriate award.
|1sMs. Moore contends that her award is, in fact, insufficient to compensate her for what has been diagnosed as a fractured vertebra and notes that her soft tissue injury is separately compensable. She insists that Dr. Mulvey’s opinion that she sustained a compression fracture is uncon-troverted by that of any other physician and that she should be fully compensated for her injuries in the range of $135,000.00 in general damages.
It is axiomatic that credibility determinations are the province of the fact-finder at trial. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990), citing, Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); and Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). We recognize that there may be some inconsistencies in Ms. Moore’s testimony and her medical records, but Dr. Trice was not called as a witness in this case, and there is no expert opinion that she did not suffer a compression fracture. As such, we find no manifest error in the award to Ms. Moore of $75,000.00, which essentially “splits the baby” between Ms. Moore on the one hand and Kailas and Colony on the other.
6.The comparative fault of Ms. Moore and Ms. Wattigney.
Finally, Kailas and Colony contend that, like Dr. Armstrong, Ms. Moore, and Ms. Wattigney knew of the leak in the air conditioning unit and its potential for danger and consequently bear some liability for their own injuries. We disagree.
Ms. Moore and Ms. Wattigney were employees of Dr. Armstrong. While Dr. Armstrong had a duty to protect invitees and his employees from a known risk, that duty does not extend to Ms. Moore and Ms. Wattigney. In fact, this court has held that an employee is not answerable for any degree of fault from a known hazard in |19the execution of his or her work duties, unless there was a reasonable alternative to his or her conduct. Although they obviously knew of the leaking water, it is clear that they did everything reasonably within their power and discretion to mitigate what they perceived as the real hazard: the presence of water on the floor. Although it seems reasonable now to surmise that the water leaking from the air conditioning unit might cause the ceiling tiles to cave in, we are mindful that hindsight is generally 20/20. There is no reason to assign any degree of negligence to their failure to prognosticate that the ceiling would fall in and injure either themselves or a patient. Our Supreme Court has held that where an employee takes actions pursuant to the discharge of his employment duties in the face of a known risk, which actions are reasonable in relation to those duties, then the employee is not comparatively negligent. Joseph v. Broussard Rice Mill, Inc., 2000-0628, p. 6 (La.10/30/00), 772 So.2d 94, 99, citing Feurtado v. Zapata Gulf Marine Corp., 99-1510, p. 7 (La.App. 4 Cir. 1/12/00), 751 So.2d 379, 383. (Emphasis added.) We find that Ms. Moore’s and Ms. Wattigney’s handling of the situation was entirely reasonable: they arrived at work early to mop the floors (for which reason a desk had to be moved to block the normal ingress to the examination rooms), they placed towels along the baseboards to catch the leaking water, and they placed fans in the hallway. It is unclear what further actions they could reasonably have been expected to take in the exercise of their jobs. The responsibility of calling an air conditioner repairman *896 rested with Kailas and Dr. Armstrong. One might surmise that calling a repairman and authorizing the cost of a repair was a decision neither Ms. Wattigney nor Ms. Moore had the authority to make.
[ 20As such, we find that the jury was in part manifestly erroneous in the award to Mr. Martin and decrease his award accordingly. The remainder of the judgment is neither manifestly erroneous nor clearly wrong and we do not find that the jury abused its discretion either in the apportionment of fault or the awards to Ms. Moore and Ms. Wattigney. For the foregoing reasons, the judgment of the trial court is reversed in part, affirmed in part, and rendered.

REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.

. We have not been asked to determine, and do not conclude, whether Kailas breached the lease agreement with Armstrong in its failure to fix, in a reasonably prompt manner, the air conditioning unit and in allowing the situation to deteriorate to the point that the ceiling tiles were saturated and fell.

. We note La. C.C. art. 2694, which provides:
If the lessor do [sic] not make necessary repairs in the manner required in the preceding article, the lessee may call on him to make them. If he refuse [sic] or neglect [sic]to make them, the lessee may himself cause them to be made, and deduct the price from the rent due, on proving that the repairs were indispensable, and that the price which he has paid was just and reasonable.
Although the parties do not cite the article and the jury charge does not specifically include the language of the article, we find that the duty-risk analysis charge to the jury implicitly covers the balancing of duties as set forth in the article.

. Dr. Shwery has a Ph.D. in clinical psychology and is not a licensed physician.

. Kailas and Colony point to the fact that Mr. Martin had been treating with Dr. Armstrong for pain management for several months and that he had consistently rated his own pain level as 10 out of 10 prior to this accident.

. Tracy v. Jefferson Parish, 523 So.2d 266 (La.App. 5 Cir.1988) ($600,000.00 for wrenched back and neck with an unsuccessful lumbar fusion, likely future surgery, traumatic anxiety condition, sexual dysfunction); Cooper v. Lacorte, 99-1726 (La.App. 4 Cir. 5/17/00), 775 So.2d 4, on reh'g., 99-1726 (La.App. 4 Cir. 1/31/01), 775 So.2d 704 ($1,200, *892 000.00 for three-level disc damage, two-level cervical fusion, and two-level lumbar fusion).

. See, Harvey v. State, Dept. of Transportation and Development, 2000-1877 (La.App. 4 Cir. 9/26/01), 799 So.2d 569, writ denied, 2002-0003 (La.3/15/02), 811 So.2d 910 (general damage award of $350,000.00 to plaintiff sustained spinal injury with immediate right-sided weakness, an umbilical hernia, left abdominal lesion and required a two-level cervical fusion with extensive hospitalization.)

. A haemangioma is an abnormal collection of blood vessels in one location. It is a congenital condition and is typically asymptomatic.