TERRI F. LOVE, Judge.
| j This appeal arises from a trial regarding injuries the plaintiff allegedly sustained as a result of a motor vehicle accident. The trial court found the defendant was 100% liable for the motor vehicle accident and awarded the plaintiff $15,000 in special damages, $50,000 in general dam *921 ages, and judicial interest from the date of judicial demand until paid, including all costs. However, the trial court did not find a causal connection between the plaintiffs left knee injury, which required surgery, and the motor vehicle accident. The plaintiff appealed alleging that the trial court committed harmful error in failing to find a causal connection between the knee injury and the motor vehicle accident, in disregarding uncontroverted evidence, and abused its discretion by awarding unreasonably low amounts for special and general damages.
We find that the trial court committed legal error in applying an adverse presumption to the medical records of one of the plaintiffs doctors. We also find that the trial court committed legal error, in failing to apply the Housley presumption to the plaintiffs injuries. After conducting a de novo review of the record, we find a causal connection between the plaintiffs left knee injury and the motor vehicle accident due to the overwhelming uncontro-verted testimony and evidence presented at trial. We amend the trial court’s award for special damages ^regarding past medical expenses, increase the award to $83,706.00, and render. We do not find that the plaintiff met his burden of proof as to future medical expenses because of the speculative nature of the evidence provided as to necessity and cost. Lastly, after our de novo review and given previous jurisprudence, we award $150,000.00 for general damages.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On February 15, 2010, Austin Marks and Curtis Lawrence were involved in a three-car motor vehicle accident, wherein Mr. Marks struck Mr. Lawrence from the rear and pushed Mr. Lawrence’s vehicle into the rear of a vehicle stopped in front of his vehicle. Three days after the motor vehicle accident, Mr. Lawrence began receiving treatment for injuries allegedly caused by the motor vehicle accident.
Mr. Lawrence filed a Petition for Damages against Mr. Marks and Government Employees Insurance Company (“GEI-CO”), as his uninsured/underinsured insurer and as Mr. Marks’ insurer, seeking special and general damages. Mr. Lawrence filed a Supplemental and Amended Petition to include State Farm Mutual Automobile Insurance Company (“State Farm”), as a vehicle insurer of Mr. Marks, and State Farm Fire and Casualty Company (“SFFCC”), as the holder of a personal umbrella policy covering Mr. Marks. Meanwhile, Mr. Lawrence settled with GEICO, as his uninsured/underinsured insurer. GEICO was dismissed with prejudice in its capacity as Mr. Lawrence’s uninsured/underinsured insurer.
SFFCC filed a Motion for Summary Judgment, which the trial court granted and dismissed SFFCC with prejudice. State Farm filed a Motion for Summary Judgment, which the trial court also granted and dismissed State Farm with ^prejudice. Mr. Lawrence then filed a Motion for Partial Summary Judgment against Mr. Marks and GEICO (collectively “Defendants”) contending that the Defendants bore “full and complete liability.” The trial court denied Mr. Lawrence’s Motion for Partial Summary Judgment. Mr. Lawrence filed a Motion for Recusal based upon the fact that Mr. Marks worked for the trial court as a “volunteer fall intern” when the trial court was ruling on pre-trial motions in the present matter. Counsel for Mr. Lawrence filed a Motion to Withdraw Recusal.[1]
*922 After a bench trial, the trial court ruled in favor of Mr. Lawrence and found that the motor vehicle accident was solely the fault of Mr. Marks. The trial court awarded Mr. Lawrence $15,000 in special damages and $50,000 in general damages. The trial court also awarded judicial interest from the date of judicial demand until paid and all costs. Mr. Lawrence’s devolutive appeal followed.
Mr. Lawrence contends that the trial court erred in finding that he did not prove a causal connection between his injuries and the motor vehicle accident, by ignoring and/or disregarding uncontroverted expert and lay testimony, abused its discretion in arbitrarily awarding $15,000 in special damages instead of $83,706.88, and abused its discretion in awarding $50,000 in general damages.
TESTIMONY & EVIDENCE[2]

CuHis Lawrence

Mr. Lawrence testified that the motor vehicle accident involving Mr. Marks occurred on February 15, 2010, and that Ronald Horn was Mr. Lawrence’s passenger. As a result of the motor vehicle accident, Mr. Lawrence allegedly | ¡/‘sustained a knee injury, a dislocated hip, thoracic and lumbar back, neck [injuries] and headaches, [and] TMJ.”[3] As to his left knee, Mr. Lawrence stated that “he had an ACL[4] rupture, ... two lateral meniscus tears, and ... chondromalacia of the knee.” Prior to the motor vehicle accident, Mr. Lawrence did not experience any medical issues or receive medical treatment related to his left knee, thoracic spine, lumbar spine, TMJ, headaches, or hip.
The impact from Mr. Marks’ vehicle “was strong enough to push me [Mr. Lawrence] into the car ahead of me.” Mr. Lawrence stated that his face hit the steering wheel and “then back against the seat and headrest.” Mr. Lawrence also testified that his left knee “just went into the dashboard.” The motor vehicle in front of Mr. Lawrence “had very minimal damage.” Mr. Lawrence testified that the driver “and Mr. Marks came upon an agreement. He paid him for his damage.” [5] Mr. Lawrence and Mr. Marks then parked in a gas station to exchange information without informing the police because the motor vehicle accident occurred the day before Mardi Gras. Mr. Lawrence testified that he experienced “some pain in the knee, back, [and a] headache” on the day of the motor vehicle accident. Mr. Lawrence stated that he visited his grandmother’s house to rest that evening and his vehicle was towed from her house.
Three days after the motor vehicle accident, on February 18, 2010, Mr. Lawrence first treated with Dr. Rick Prewitt at the ■Prewitt Chiropractic Clinic. Mr. Lawrence informed Dr. Prewitt about his “[k]nee, back, neck, [and] headaches.” Mr. Lawrence stated that Dr. Prewitt took x-rays of his knee, tested his ligaments, | ¡¡utilized heat and ice pack therapy, a TENS unit, and “things like that.”
*923 Regarding his headaches, Mr. Lawrence stated that he has headaches on “[a]bout a daily basis until [he] was put on the medicine.” He expounded that “the medicine has kind of been able to control [headaches] to a certain extent.” Mr. Lawrence explained that his headaches remain the same in type as the headaches he began to suffer after the motor vehicle accident. Mr. Lawrence continues to take Naprelan 500, Klonopin, and Soma, and stated that the prescriptions cost “[a]bout $491 a month.” Mr. Lawrence testified that he is still participating in physical therapy for his back and his left knee. He expects another three months of physical therapy will be required.
TMJ caused Mr. Lawrence to experience spasms in his jaw to such an extent that he could not eat certain foods. After wearing a TMJ splint “all the time” for approximately a year, Mr. Lawrence’s TMJ has “gotten better since the accident.” However, Mr. Lawrence suffers from a “spasm from time to time depending on what [he] eat[s] ... or if he “laugh[s] too hard, something like that.” When his jaw begins to hurt, Mr. Lawrence uses a warm or cool towel and takes either Advil or Aleve. Mr. Lawrence stated that his jaw spasms “[m]aybe once a week.”
Dr. Prewitt allegedly informed Mr. Lawrence that his hip was “out of line” and performed adjustments to his spine and hip. The adjustments “helped to a certain extent,” but Mr. Lawrence continues to experience pain in his left hip. Mr. Lawrence testified that “maybe once or twice a week” if he has “been walking too long,” his “hip — the pain will radiate down or it will kind of like tender type hip.”
Since the motor vehicle accident, Mr. Lawrence testified that he is unable to exercise as he did before and that he is “[n]ot as active.” Mr. Lawrence stated that he “can’t look at a computer” and that he “couldn’t concentrate at school.” Mr. |7Lawrence testified that the total amount of medical expenses he incurred as a result of the motor vehicle accident was $88,-706.00.”[6]
During cross-examination the Defendants elicited testimony, after the trial court sustained Mr. Lawrence’s objection, regarding Mr. Lawrence’s income.[7] Mr. Lawrence stated that he made $25,000 in 2009, $277,000 in 2010, and $300,000 in 2011 from his long-haul trucking company. The Defendants questioned Mr. Lawrence regarding private student loans that he utilized to purchase a computer, books, and some properties. Mr. Lawrence testified that he borrowed $25,000 to pay for college. However, he “decided” that he “wanted to use it — some of it to buy property.” Mr. Lawrence also admitted, via the Defendants’ questions, that he was involved in a court case regarding disciplinary problems when he was in high school. The trial court stated the following regarding the admissibility of the above-mentioned testimony: “I allowed it in for credibility ... but it goes to his credibility. And obviously, I’m going to have to read the decision and see what it says.”

Curtis Jude Lawrence, Sr.

Mr. Lawrence’s father testified that before the motor vehicle accident his son was “[a]ctive, very involved, busy body, constantly going, always moving, health [sic].” Prior to the accident, his son did not experience any back problems, left knee prob *924 lems, TMJ, or problems with headaches. Mr. Lawrence, Sr. stated that Mr. Lawrence was “a little disoriented” after the motor vehicle accident. He testified that his son was complaining of back pain and’ knee pain. Mr. Lawrence, Sr. testified that following the motor vehicle accident his son was “not active at |sall,” he cannot assist with work around the home, and has trouble sleeping. Mr. Lawrence told his father that he struggled with problems concentrating at school, as well as suffered from back pain and knee pain. Further, Mr. Lawrence, Sr. stated that his son sleeps on the floor “[a] lot” due'to problems with sleeping in his bed and that he becomes “a little moody sometimes.”

Austin Marks

Mr. Marks testified that on the day of the motor vehicle accident he did not take any medications or consume any alcohol. Although he “screeched” on his brakes, his “front hood hit his [Mr. Lawrence’s] back hood.” Mr. Marks stated that the driver in front of Mr. Lawrence left the scene. Mr. Marks also testified that he did not pay that driver any money. Mr. Marks stated that neither he nor Mr. Lawrence called the police because the motor vehicle accident occurred the day before Mardi Gras. Mr. Marks believed that Mr. Lawrence was not injured because he was allegedly walking around and bending after the motor vehicle accident. They exchanged information and Mr. Marks telephoned Mr. Lawrence the following day wherein Mr. Lawrence indicated that he was enjoying Mardi Gras. Mr. Marks testified that “the impact was — was minimal enough that all of our cars just stayed straight.” Mr. Marks stated that both vehicles were “drivable” and that he believed he was at fault for the motor vehicle accident.

Ronald Horn, Jr.

Mr. Ronald Horn, Jr. was Mr. Lawrence’s passenger at the time of the motor vehicle accident. Mr. Horn described the impact as a heavy impact and a seven on a scale of one to ten. After exiting the vehicle, Mr. Horn reentered Mr. Lawrence’s vehicle to sit. When Mr. Horn attempted to explain what he overheard Mr. Marks say to the first driver, the trial court would not allow the testimony. From Mr. |9Horn’s vantage point in Mr. Lawrence’s vehicle, he was unable to see Mr. Marks give anything to the first driver that he knew was money.

Dr. Rand Marcel Voorhies

Dr. Rand Voorhies, Mr. Lawrence’s expert in neurosurgery as well as Mr. Lawrence’s treating neurosurgeon, testified that he treated Mr. Lawrence since September 8, 2010, and that he is in the best position to determine Mr. Lawrence’s injuries from a neurological perspective and the cause of the injuries. Dr. Voorhies stated that Mr. Lawrence’s cervical pain was medically more probable than not caused by the motor vehicle accident of February 15, 2010. The motor vehicle accident medically more probable than not also caused Mr. Lawrence’s lumbar and thoracic spine injuries, as well as his headaches. Dr. Voorhies’ “initial medical narrative report” from September 8, 2010, provided that:
[p]art of the injury sustained involved the left knee, and I understand that surgical intervention has been recommended for torn ligaments in the knee. I think Dr. Prewitt is correct in that at least part of the persistent back problems are related to gait and balance as a result of the knee problem. On the other hand there is some focal tenderness and localization of pain over the mid thoracic region, which was not imaged by the lumbar MRI.
*925 In treating Mr. Lawrence, Dr. Voorhies utilized Mr. Lawrence’s history, physical exam, and diagnostic tests.
Dr. Voorhies testified that Mr. Lawrence complained of “[m]id-thoracic pain with some radiation into the lower lumbar area and to the iliac crest regions bilaterally” and “[a]lso [the] left knee.” “Mr. Lawrence was initially rather shaken up, but later that day began to experience symptoms that progressed over the next day or so.” Dr. Voorhies stated that there was a temporal connection between Mr. Lawrence’s pain and the motor vehicle accident. While performing a verbal 110history of Mr. Lawrence, Dr. Voorhies learned that Mr. Lawrence never experienced back problems of this “severity” and “longevity” or back problems that interfered with sleep. Prior to meeting with Mr. Lawrence, Dr. Voorhies reviewed the medical records from Dr. Prewitt and Dr. Stephen Tramuta, as well as a lumbar MRI.[8] Dr. Voorhies testified that Mr. Lawrence had “bulges” at the L-2-3 and L-3-4 with “slight dextroseoliosis with the apex at L-1.” Dr. Voorhies stated that there was no evidence to show whether Mr. Lawrence had the “bulges” prior to the motor vehicle accident or whether the “bulges” appeared after the motor vehicle accident. Dr. Voorhies performed a physical exam and found “tenderness over the knee, tenderness over the mid-thoracic spine,” but “[n]o nerve damage.”
Dr. Voorhies recommended additional diagnostic tests, which depicted a “[v]ery small bulge at T1-T2, but” he “did not judge it to be clinically significant.” Mr. Lawrence was still suffering from “axial joint pain of the thoracic spine,” so Dr. Voorhies recommended “a SPECT[9] scan.” One and a half years after the motor vehicle accident, Mr. Lawrence continued to suffer from thoracic lumbar pain. Mr. Lawrence’s thoracic SPECT scan from May 2012,[10] showed “minimally increased activity in the anterior column of the mid-thoracic spine” and “increased metabolic activity,” which is indicative of infection, cancer, or post-traumatic inflammation. Accordingly, Dr. Voorhies ordered a CT[11] scan, which revealed “increased focal metabolic activity in the anterior column.” The abnormality was in the same location as Mr. Lawrence’s pain. Thus, Dr. Voor-hies stated that this [^reinforced the diagnosis. Dr. Voorhies then referred Mr. Lawrence to an interventionist for an epidural steroid injection (“ESI”) in the thoracic spine at the T-7, 8, and 9 as a target zone. The ESI “procedure had been terrifically effective,” which “strongly suggests that the pain is on that area some place.” Dr. Voorhies found that it was medically more probable than not that the need for the ESI treatment was caused by the motor vehicle accident. Dr. Voorhies recommended a series of ESI procedures, “generally up to three.” Dr. Voorhies stated that there was a possibility that Mr. Lawrence would require more than three ESI procedures.
As part of Dr. Voorhies’ treatment, he looks for signs or symptoms of magnification or exaggeration of symptoms, but he ' did not see any of this while treating Mr. *926 Lawrence. Dr. Voorhies testified that Mr. Lawrence could not fake the objective tests depicting the thoracic and lumbar bulges and abnormalities. However, it is the doctor’s responsibility to determine the cause and extent of the injuries. Dr. Voorhies testified: “[i]n my view, three to five years of the prognosis would be a good guess,” which meant that Dr. Voorhies “would expect him to slowly, incrementally get better within that framework.” However, Dr. Voorhies stated that the bulges will worsen over time.
In 2011, Dr. Voorhies did not “believe that surgical intervention would be in Mr. Lawrence’s best interest” and did not recommend surgery. Also in his 2011 report, Dr. Voorhies believed Mr. Lawrence suffered from “[wjidespread axial joint pain with post traumatic cephalgia.” By February 11, 2011, Dr. Voorhies began to “wonder if these headaches could be a variant of post traumatic migraines.” However, Dr. Voorhies deferred to Dr. Daniel Trahant as to the treatment of Mr. Lawrence’s headaches. Dr. Voorhies remained a part of Mr. Lawrence’s diagnostic team at the time of the bench trial.
1120r. Scott Montgomery
Dr. Scott Montgomery, Mr. Lawrence’s expert in orthopedic sports medicine and Mr. Lawrence’s treating orthopedic surgeon with respect to the motor vehicle accident, stated that he has been treating Mr. Lawrence consistently since May 2010. Dr. Montgomery testified that he is in the best position to discuss Mr. Lawrence’s knee injuries from the motor vehicle accident. Dr. Montgomery related Mr. Lawrence’s knee complaints and knee treatment to a reasonable degree of medical probability to the February 15, 2010 motor vehicle accident. Further, Dr. Montgomery testified that Mr. Lawrence’s knee operation on September 17, 2012, was more probable than not causally related to the motor vehicle accident. Dr. Montgomery was unaware of any complaints by Mr. Lawrence regarding his left knee prior to the motor vehicle accident.
On May 18, 2010, Dr. Montgomery reviewed Mr. Lawrence’s complaints of “knee pain and instability,” performed a physical exam, reviewed an MRI, and discussed treatment options. The physical exam showed “a knee that had instability” and ACL test results that correlated with the MRI showing an ACL tear. The MRI depicted “a complete tear of his anterior cruciate ligament, as well as a tear in his meniscus, his lateral meniscus, and some cartilage wear.” Dr. Montgomery recommended that Mr. Lawrence undergo ACL reconstruction surgery.
Mr. Lawrence informed Dr. Montgomery that his knee injury was a result of the motor vehicle accident. Dr. Montgomery stated that the knee injury “could” result from a rear end collision. When Dr. Montgomery re-examined Mr. Lawrence in March 2011, Mr. Lawrence “still seemed unstable,” and “was symptomatic from what appeared to be his knee injury.” Dr. Montgomery | iarecommended another MRI and again “to stabilize his knee with an ACL reconstruction.” Mr. Lawrence had the “central third of his patella tendon for his ACL reconstruction surgery with no complications” on September 17, 2012. Physical therapy following the surgery is “typically six to nine months,” but “can be longer.”
Dr. Montgomery testified that Mr. Lawrence could not fake the injury. Mr. Montgomery also confirmed Mr. Lawrence’s complaints of pain and instability. He stated that no future surgery or diagnostic testing was scheduled. Dr. Montgomery testified that there was no reason to doubt Mr. Lawrence’s history regarding his knee injury. In support, Dr. Montgomery noted that the first MRI on May *927 17, 2010, and the follow-up MRI in August 2012 “were similar” and showed no worsening of the injury.
On cross-examination, Dr. Montgomery was asked about an alleged knee injury sustained by Mr. Lawrence while playing basketball after the motor vehicle accident. Dr. Montgomery testified that he believed that Mr. Lawrence was able to walk away from the motor vehicle accident and attempted to continue playing basketball. While Mr. Lawrence allegedly landed “awkwardly” and felt his knee buckle, Dr. Montgomery stated that the ACL was torn in the motor vehicle accident based on Mr. Lawrence’s history. Dr. Montgomery did not review the medical records of the other doctors.

Dr. Robert Applebaum 
[12]

Dr. Robert Applebaum, the Defendants’ expert in neurosurgery who performed an independent medical exam of Mr. Lawrence on August 2, 2012, 114reviewed Mr. Lawrence’s medical records. After meeting with Mr. Lawrence once, with a combined time of approximately thirty minutes for both a patient history and a physical exam, Dr. Appleb-aum did not feel any tightness/spasm in Mr. Lawrence. He stated that “the absence of a spasm rules against any significant injury in that particular area.” Further, Dr. Applebaum testified that “even with a sprain or a strain or a soft tissue injury you’d expect some muscle spasm.” Dr. Applebaum observed that Mr. Lawrence experienced pain when he rotated the left hip internally, “which might suggest a problem with the left hip.”
After reviewing the 2012 SPECT scan, Dr. Applebaum testified that Mr. Lawrence’s “lumbar area appeared normal,” but viewed “some vague increased uptake in the mid-thoracic region of unknown significance.” He stated that the 2012 CT scan of Mr. Lawrence’s thoracic spine showed no “significant abnormalities.” In the 2011 MRI of Mr. Lawrence’s thoracic spine, Dr. Applebaum saw “some minimal bulging of the TI, T2 disc and of the T12-L1 disc, which” he “did not feel was of any clinical significance.” Dr. Applebaum did not see anything in Mr. Lawrence’s thoracic spine that would cause pain. He did not recommend any future surgery or treatment.
Dr. Applebaum’s written report stated that “Mr. Lawrence was complaining of pain in his low back and in his left knee,” as well as “headaches and some pain in his left hip.” Dr. Applebaum further stated that “[fjrom the history, the patient sustained an injury to his low back and possibly his lower thoracic region in an accident over two years ago. He also sustained an injury to his left knee, which has been treated by an orthopedist.” Further, Dr. Applebaum opined that:
it is my opinion that the patient does not have disease or damage involving the spinal cord or nerve roots. I feel he is at maximum medical improvement. I see no need 11sfor further neurosurgical, diagnostic or therapeutic procedures and from a neurological point of view, I find no evidence of impairment.
Dr. Applebaum’s opinions are based on approximately one hour and fifteen minutes, which includes taking Mr. Lawrence’s history, the physical exam, and reviewing medical records. However, Dr. Applebaum would defer to Dr. Montgomery in regards to hip pain allegedly caused by the motor vehicle accident. Dr. Ap-plebaum believes Mr. Lawrence sustained *928 a lower back injury, a left knee injury, and an injury in the thoracic spine area in the motor vehicle accident. Finally, Dr. Ap-plebaum stated that Mr. Lawrence’s treating physician was “[pjrobably in a better position to determine Mr. Lawrence’s injuries and the extent of those injuries.
Dr. Daniel Trahant[13]
Dr. Trahant, the Defendants’ expert in neurology and Mr. Lawrence’s treating neurologist[14] for the motor vehicle accident, began treating Mr. Lawrence in September 2011, and stated that he is the most familiar with Mr. Lawrence’s neurological symptoms.
Mr. Lawrence informed Dr. Trahant that his headaches began the day of the motor vehicle accident and continued on an almost daily basis. Mr. Lawrence was also experiencing pain in “the posterior neck.” Dr. Trahant testified that Mr. Lawrence’s “headaches occurred in the back of his head and seemed to spread from the posterior cervical area.” Mr. Lawrence informed Dr. Trahant that he had “no previous neck pain, back pain or headaches, and no previous injuries.” Mr. | lfiLawrence had a “slight muscle spasm and tenderness in the upper cervical portion of the trapezius muscles bilaterally, somewhat more so on the right ... with a particular point area of tenderness — in the area of the insertion of the trapezius muscles on the occiput.” Dr. Trahant found a “mild cervical paraplegia muscle spasm” in Mr. Lawrence. Dr. Trahant believed Mr. Lawrence’s “headaches were muscle contraction and [sic] type and cer-vicogenic.” Mr. Lawrence “had a flexion extension neck injury or at least two extension neck injuries.” Dr. Trahant found a temporal connection between Mr. Lawrence’s headaches and the motor vehicle accident. Dr. Trahant stated that medically more probable than not the spasm was related to the motor vehicle accident. After receiving the thoracic ESI, Mr. Lawrence’s complaints of pain and popping in the thoracic area lessened. Dr. Trahant does not believe Mr. Lawrence is a candidate for surgery.
Dr. Trahant actively looks for symptoms of magnification or exaggeration in patients, but these symptoms were “[a]bso-lutely not” present in Mr. Lawrence. Mr. Lawrence’s injuries were consistent with the motor vehicle accident. Dr. Trahant found that it was medically more probable than not that Mr. Lawrence’s headaches were caused by the motor vehicle accident. Dr. Trahant stated that Mr. Lawrence’s headaches were “under good control” with medication. He found that it was medically more probable than not that Mr. Lawrence would need to remain on Naprelan indefinitely.
Dr. Trahant stated, in a letter to Dr. Voorhies dated September 20, 2011, that Mr. Lawrence had “difficulty concentrating and retaining information.” On September 5, 2012, Dr. Trahant wrote counsel for Mr. Lawrence and stated that he agreed “with Dr. Voorhies [sic] recommendation in his report of July 19, 2012, for epidural steroid injection in the T7, 8, and 9 areas.” On February 4, 2013, Dr. 117Trahant noted that Mr. Lawrence “has had no change in the popping in his lower thoracic spine on rotating to either side. Again, he demonstrated in the office the audible pop on rotating his spine either to *929 the left or right.” Dr. Trahant wrote to Mr. Lawrence’s counsel again following the first ESI treatment and noted the helpfulness of ESI. Dr. Trahant instructed Mr. Lawrence to “return to Dr. Crapanza-no for his opinion regarding further injections.”

Prewitt Chiropractic Clinic

Mr. Lawrence first visited Dr. Prewitt’s clinic on February 18, 2010, three days after the motor vehicle accident, and was treated by Dr. Prewitt “25 times over a period of about 3 and ½ months.” Mr. Lawrence completed forms containing his patient information wherein he circled the left lmee to indicate that he was suffering from pain in that area. The form also shows that Mr. Lawrence originally circled the right knee as well, but then crossed it out and wrote “no” next to the right knee. These patient information forms were completed by Mr. Lawrence and not by a doctor.
The records demonstrate .that Mr. Lawrence indicated that he was suffering from pain in his head, neck, shoulders, lower back, left leg, left knee, as well as suffering from a severe headache. The records also reflect that Mr. Lawrence had “swelling in the left knee area.” Mr. Lawrence was diagnosed with a “thoracic and lumbar — sacral sprain — strain associated with vertebral misalignment resulting in nerve impingement and complicated by temporal mandibular joint dysfunction with muscle spasms and ligamentus sprain.” Dr. Prewitt concluded that “these injuries were a direct result of the automobile accident that occurred on February 15, 2010.”
When Mr. Lawrence’s “left knee seemed to worsen,” Dr. Prewitt suggested |1Rthat Mr. Lawrence “get an orthopedic consultation concerning his knee.” Dr. Prewitt “suspected that the knee problem could be prolonging the low back problem.” Accordingly, Dr. Prewitt instructed Mr. Lawrence “that until the knee problem is completely handled, the low back” was “going to continue to hurt.”
The medical records from Dr. Prewitt’s clinic show some discrepancy as to which knee Mr. Lawrence injured. While Dr. Prewitt’s June 3, 2010 report indicates that Mr. Lawrence injured his left knee, the “Examination Findings” form from February 18, 2010, contains doctor’s “comments” indicating that Mr. Lawrence was suffering from “Rt knee pain.” However, in the “Daily Notes” from February 18, 2010, the handwritten notes document Mr. Lawrence was suffering from left leg pain. Mr. Lawrence received ultrasound treatment to his left knee on February 25, 2010, after complaining of knee pain, as indicated in the “Daily Notes.” On March 1, 2010, the “Daily Notes” reflect that something was noted regarding the range of motion in both of Mr. Lawrence’s knees. However, the exact nature of the notation is unclear. The March 11, 2010 “Daily Notes” document that Mr. Lawrence received an ultrasound treatment to his left knee. On March 15, 2010, the “Daily Notes” reflect that Mr. Lawrence was suffering with problems with his left leg. The March 29, 2010 “Daily Notes” note that Mr. Lawrence stated that he was suffering from left knee pain when he was on his feet “a great deal.” On April 5, 2010, the “Daily Notes” state that Mr. Lawrence was symptomatic of “Rt knee pain.” The “Daily Notes” from April 20, 2010, document that Mr. Lawrence was suffering from left knee pain and indicated a therapy treatment for his left knee. On April 27, 2010, the “Daily Notes” reflected that Mr. Lawrence continued to suffer from knee pain. However, the handwritten notes are unclear as to whether it was the right knee or left knee. The “Daily hoNotes” from May 4, 2010, state that Mr. *930 Lawrence would be meeting with an orthopedist in New Orleans for his knee pain.

Advanced Rehab Center Records

Mr. Lawrence indicated to Dr. Tramuta, of the Advanced Rehab Center, that he was suffering from pain in his lower back and left leg, as well as headaches. Dr. Tramuta stated in his “Initial Examination Report” from June 10, 2010, that “Mr. Lawrence’s symptom complaints and physical exam findings are consistent with the diagnosis listed.” Dr. Tramuta further found that:
[t]he functional dynamics of the accident as described by the patient and the overall results of the physical exam and orthopedic tests determines more probable than not that the current condition is a result of the accident which occurred on February 15, 2010, and the injuries were derived from the reported mechanism of insult.
On August 3, 2010, Dr. Tramuta wrote a letter stating that it was his “professional opinion that [Mr. Lawrence] be further evaluated by a neurosurgeon.” Mr. Lawrence was released from Dr. Tramuta’s care on August 10, 2010.

Stand-Up Open MRI Centers of Louisiana

Mr. Lawrence indicated left knee pain on the forms completed for his February 3, 2011 MRI.

R. Brett Rabel, D.D.S.

Mr. Lawrence initially treated with Dr. Rabel for his TMJ related pain. Dr. Rabel then referred Mr. Lawrence to Dr. David Scaffidi for “TMD therapy.”

Dr. David Scaffidi, D.D.S.

Dr. Scaffidi treated Mr. Lawrence for his TMJ issues following the motor vehicle accident and prepared Mr. Lawrence’s TMJ splint. Dr. Scaffidi’s official diagnosis, as reported to GEICO, was as follows:
[ anCurtis has been a patient of mine since December 2007 for orthodontic treatment. He has never had any TMJ problems in the past. He came to me on 4-6-2010 because his general dentist referred him here for TMD therapy due to extreme jaw pain resulting from the injury that occurred on 2-15-10.
Curtis’ treatment will begin with a TMD splint. In combination with the splint, physical therapy exercises will be utilized to resolve the severe pain and resulting headaches. Curtis will be seen on approximately a 1 week basis for monitoring and treatment.
Eventually, by June 28, 2010, Mr. Lawrence’s problems associated with TMJ were decreasing and Dr. Scaffidi “advised Mr. Lawrence to use the splint on an as-needed basis.” At that point, Dr. Scaffidi “ended his TMJ treatment.”

TRIAL COURT’S REASONS FOR JUDGMENT

The trial court found “that the accident in question was solely the fault of the defendant, Austin Marks.” However, the trial court stated that the “controversy is the extent of the physical injuries claimed by” Mr. Lawrence and stated that “[m]any of his supposed injuries depend on” his credibility. After assessing Mr. Lawrence, the trial court found “that Mr. Lawrence was not a credible witness.” However, the trial court believed that Mr. Lawrence “was injured to some degree and” was “entitled to be compensated.”
The trial court stated that Mr. Lawrence’s “[l]ess than honest behavior can be traced back to his senior year at St. Augustine High School” because Mr. Lawrence appealed discipline imposed following alleged sanctionable infractions regarding plagiarism. The trial court stated that the incident was “so significant that it became the subject of a lawsuit in Civil *931 District Court.” Thus, the trial court’s credibility determination was partially based upon Mr. Lawrence’s high school decision to appeal the discipline imposed by St. Augustine High School to |aithe Orleans Parish Civil District Court.
Secondly, the trial court found that Mr. Lawrence was incredible based on his assertion that Mr. Marks gave something to the driver of the first motor vehicle in exchange for leaving the scene. The trial court characterized the testimony as follows: “Mr. Horn denied seeing Mr. Marks give anything to the driver of the first car. This Court cannot help but conclude that Mr. Lawrence will say anything for economic gain. His own friend, however, would not lie on his behalf.” However, this is a mischaracterization of Mr. Horn’s testimony. Mr. Horn testified that he went back to sit in Mr. Lawrence’s motor vehicle while Mr. Lawrence and Mr. Marks were talking to the first driver. When asked if he saw Mr. Marks “give anything to the driver,” Mr. Horn stated, “Uh, well, I think I heard Mr. Marks asking him — ,” at which point the trial court sustained an objection preventing Mr. Horn from completing his response. Mr. Horn did testify that he did not witness Mr. Marks give that first driver anything that he knew was money. This all allegedly occurred when Mr. Horn returned to Mr. Lawrence’s motor vehicle.
Thirdly, the trial court found that Mr. Lawrence “misled Dr. Applebaum about his employment” because the medical records do not reflect that Mr. Lawrence informed Dr. Applebaum that he ran a trucking company. This Court notes that it is unknown why this fact is absent from Dr. Applebaum’s testimony or medical records. However, this Court is also mindful that Dr. Applebaum testified that he spent thirty minutes or less on his physical examination and personal history of Mr. Lawrence.
Lastly, the trial court stated that “Mr. Lawrence admitted that he misled lending institutions about the intended purpose of loan money” because he used some of “the money for personal investments.” Mr. Lawrence testified that he [ a2took out private student loans and utilized the money to purchase a computer, some books, and some investment properties. Mr. Lawrence stated the following:
[w]ell, the bank said it was a private student loan, it could be used for whatever I intended it to be used for. But I did buy a computer, I did buy books. I just had a lot of money left over. I wasn’t going to spend $25,000.00 at one time in school. School didn’t cost nothing [sic] but $2,000.00 a semester.
When questioned by the trial court again as to his motivation, Mr. Lawrence testified that $25,000.00 would “put” him “through the rest of’ his “schooling for all the years and then I decided that I wanted to use it — some of it to buy property.”
The trial court also found that Mr. Lawrence’s behavior was “inconsistent with the severity” of his claims because he did not go to an emergency room, waited three days to seek medical treatment, and had “gaps” within his medical treatment. Further, the trial court took issue with Mr. Lawrence’s ability to graduate from college and have a successful trucking business. The trial court stated: “[h]e was also apparently well enough to pursue his degree while at the same time developing and working a trucking business.”
Mr. Lawrence’s “claim for the left knee injury” was the “most troubling” for the trial court. When summarizing the medical records of Dr. Prewitt, the trial court concluded that Dr. Prewitt treated Mr. Lawrence’s right knee, as opposed to his left knee, due to a few medical records *932 indicating that Mr. Lawrence’s right knee was injured. Additionally, the trial court concluded “that the choice” not to call Dr. Prewitt as a witness “was purposeful.” The trial court stated that “the plaintiff knew that Dr. Prewitt would have to state under oath that Mr. Lawrence’s initial complaints were with regard to his right knee.” Further, the trial court made | Mthe legal conclusion that “[t]he defendants are entitled to the presumption that, if Dr. Prewitt had been called to testify at trial, he would have said that the right knee was the one injured in the accident.”
Based on the trial court’s adverse presumption and conclusion that Mr. Lawrence’s right knee was injured instead of his left knee, the trial court discredited the testimony of Dr. Trahant even though Dr. Trahant testified that any reference to Mr. Lawrence’s right knee in his medical records was a typographical error. The trial court also discredited the testimony of Dr. Montgomery because Dr. Montgomery treated Mr. Lawrence based on the patient history he provided. However, Dr. Montgomery testified that Mr. Lawrence discussed his knee buckling while attempting to play basketball with him. Yet, Dr. Montgomery concluded that the motor vehicle accident injured Mr. Lawrence’s left knee and caused his inability to play basketball. Based on this conversation with Dr. Montgomery, the trial court concluded “that the need for left knee surgery was caused solely by the intervening basketball injury.”
The trial court then discredited Dr. Voorhies’ testimony and objective test results regarding Mr. Lawrence’s back based upon the fact that Dr. Voorhies relied upon Mr. Lawrence’s patient history. The trial court believed that Mr. Lawrence “had back and neck pain as well as headaches caused by the” motor vehicle accident. However, the trial court found “that the pain more likely than not lasted for six months as opposed to the on-going pain described ... by the plaintiff.” Further, the trial court stated that “[tjhis case has unique issues of credibility, causation, duration of treatment and significant gaps in treatment” and held that there was “no need for future treatment so no future medicals” were awarded.

J¡¿ADVERSE PRESUMPTION

The trial court applied an adverse presumption and ruled that Dr. Prewitt’s live testimony would have been against Mr. Lawrence’s best interests and proven that Mr. Lawrence’s right knee was the knee injured in the motor vehicle accident, as opposed to his left knee.
“In civil cases there is a presumption of adverse testimony by witnesses who are subpoenaed but not called upon to testify.” Wilson v. U.S. Fire & Cas. Co., 593 So.2d 695, 700 (La.App. 4th Cir.1991). “This adverse presumption is referred to as the ‘uncalled witness’ rule and applies “when “a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence” and fails to call such witnesses.’ ” Driscoll v. Stucker, 04-0589, p. 19 (La.1/19/05), 893 So.2d 32, 47, quoting 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 4.3 (1999). “The jurisprudence is well-settled to the effect that where a litigant fails to produce evidence or witnesses available to him and no reasonable explanation is made therefore, the presumption is that the production of such evidence or witnesses would have been unfavorable to his cause.” Wilson, 593 So.2d at 700. However, “[t]he adverse presumption rule suggested by plaintiff must be tempered by the proposition that a party to a lawsuit need only to prove his case.” Id. “If he does so by calling one or more witnesses to testify *933 concerning an issue, he should not be penalized because he fails to call still another witness on the subject.” Id. Additionally, “adverse presumption is inapplicable when the witness is equally available to both parties.” Dixon v. Travelers Ins. Co., 02-1364, p. 16 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, 488.
Dr. Prewitt was listed on both Mr. Lawrence’s and the Defendants’ Witness and Exhibit Lists. However, neither party subpoenaed Dr. Prewitt for trial. There 12„has been no demonstration that Dr. Prewitt was not equally available to both parties. See Hernandez v. Schwegmann Giant Supermarkets, 464 So.2d 902, 907 (La.App. 4th Cir.1985). Although Dr. Prewitt was once one of Mr. Lawrence’s treating physicians, the Defendants could have called Dr. Prewitt to the witness stand as easily as Mr. Lawrence. Thus, the application of adverse presumption was not warranted. See In re Succession of Barattini, 11-752, p. 9 (La.App. 5 Cir. 3/27/12), 91 So.3d 1091, 1096.
Additionally, Dr. Prewitt’s testimony would likely be repetitive of the voluminous medical testimony presented at trial. See Wilson, 593 So.2d at 700. Dr. Voor-hies testified about Mr. Lawrence’s neurological injuries and treatment. Dr. Montgomery, as Mr. Lawrence’s orthopedic surgeon, testified regarding Mr. Lawrence’s treatment for his knee injury. Dr. Applebaum, the Defendants’ expert in neurosurgery, also believed, after performing an independent medical examination, that Mr. Lawrence sustained a lower back injury, a left knee injury, and an injury in the thoracic spine area in the motor vehicle accident. Dr. Trahant, as Mr. Lawrence’s treating neurologist, testified regarding Mr. Lawrence’s headaches and ESI treatment.
Therefore, we find that the trial court committed legal error in giving the Defendants the adverse presumption that Dr. Prewitt’s testimony would have been against Mr. Lawrence’s best interests and proven that Mr. Lawrence’s right knee was the knee injured in the motor vehicle accident, as opposed to his left knee. This legal error caused the trial court to discredit much of the medical testimony and evidence presented at trial. Meaning, the legal error was prejudicial because it [^interdicted the factfinding process.[15] See Parfait v. Transocean Offshore, Inc., 04-1271, p. 28 (La.App. 4 Cir. 8/10/07), 992 So.2d 465, 482. As such, we must conduct a de novo review of the record. See Lam ex rel. Lam v. State Farm Mut. Auto. Ins. Co., 05-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135.

CAUSATION

“Causation is a factual issue.” D’Angelo v. Guarino, 10-1555, p. 6 (La.App. 4 Cir. 3/9/12), 88 So.3d 683, 688. “Although the Louisiana Constitution extends appellate jurisdiction in civil cases to both law and facts, the exercise of this power is limited by the jurisprudential rule that factual determinations of the trier of fact will not be set' aside by a reviewing court unless they are manifestly erroneous or clearly wrong.” Brewer v. J.B. Hunt Transp., Inc., 09-1408, p. 9 (La.3/16/10), 35 So.3d 230, 237. “To reverse a factfinder’s determination ... an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reason *934 able factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly -wrong.” Brewer, 09-1408, p. 12, 35 So.3d at 239.
“ ‘The test for determining the causal relationship between an accident and a subsequent injury is whether the plaintiff proved through medical and lay testimony that it is more probable than not that the subsequent injuries were caused by the accident.’ ” D’Angelo, 10-1555, p. 6, 88 So.3d at 687, quoting Williams v. Stewart, 10-0457, p. 6 (La.App. 4 Cir. 9/22/10), 46 So.3d 266, 272. “It is well settled in Louisiana that the trial court is not bound by the testimony of an expert, |27but such testimony is to be weighed the same as any other evidence.” Lanasa v. Harrison, 02-0026, p. 4 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605. “A trial court may accept or reject in whole or in part the opinion expressed by an expert.” And “[t]he effect and weight to be given to expert testimony is within the broad discretion of the trial judge.” Id.
The Louisiana Supreme Court stated that:
[a] claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Housley v. Cerise, 579 So.2d 973, 980 (La.1991), quoting Lucas v. Ins. Co. of N. Am., 342 So.2d 591, 596 (La.1977). “ ‘Housley leaves no uncertainty that the presumption is applicable to personal injury cases in which the medical evidence shows there is a reasonable possibility of causal connection between the accident and the medical condition.’ ” Juneau v. Strawmyer, 94-0903, p. 5 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1298-99, quoting Arceneaux v. Howard, 633 So.2d 207, 210 (La.App. 1st Cir.1993). The reasonable possibility of a causal connection must be demonstrated “through evidence — medical, circumstantial, or common knowledge.” Juneau, 94-0903, p. 6, 647 So.2d at 1299. “If the plaintiff can show that she is entitled to the presumption of causation, the burden of proof then shifts to the defendant to prove that some other particular incident could have caused the injury.” Johnson v. State through Dep’t of Pub. Safety & Corr., 95-0003 (La.App. 1 Cir. 10/6/95), 671 So.2d 454, 457. See also Maranto v. Goodyear Tire & Rubber Co., 94-2603, p. 6 (La.2/20/95), 650 So.2d 757, 761 |28(“In order to defeat the presumption, defendant must show some other particular incident could have caused the injury in question.”).
“When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). “[O]nly the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Id. “Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a-finding purportedly based upon a credibility determination.” Id., 549 So.2d 840, 844-45. “But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that *935 finding can -virtually never be manifestly erroneous or clearly wrong.” Id., 549 So.2d at 845. “This is not to say, however, that factual determinations cannot ever, or hardly ever, be upset.” Brewer, 09-1408, p. 13, 35 So.3d at 240. “Although deference to the factfinder should be accorded, because appellate courts have a constitutional duty to review both law and facts, they have the right and the obligation to determine whether a trial court verdict is clearly wrong based on the evidence, or clearly without evidentiary support.” Id. The factfinder must be “justified in his conclusions.” Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). “An appellate court is not required, because of the foregoing principles of appellate review, to affirm the trier of fact’s refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no | ggsound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles.” Id.

Housley Presumption

“[I]f the plaintiff [was] entitled to the presumption of causation and the district court failed to apply the presumption, legal error resulted requiring a de novo [sic] review of the entire record to determine if causation was proved.” Johnson, 95-9003, 671 So.2d at 457. Thus, although the trial court’s legal error regarding adverse presumption requires a de novo review, we must also determine if Mr. Lawrence was entitled to the Housley presumption. First, we find that Mr. Lawrence proved that he was in good health prior to the motor vehicle accident. Mr. Lawrence and Mr. Lawrence, Sr. testified that Mr. Lawrence lead a very active lifestyle, including frequently participating in basketball, prior to the motor vehicle accident. However, after the motor vehicle accident, Mr. Lawrence was unable to continue with his active lifestyle. The un-controverted lay testimony also reasonably establishes that Mr. Lawrence did not suffer from back pain, headaches, TMJ, hip pain, or any left knee injuries prior to the motor vehicle accident.
Next, Mr. Lawrence demonstrated that his “symptoms of the alleged injury began with the accident and were thereafter continuously manifested.” Johnson, 95-0003, 671 So.2d at 457. The voluminous live testimony and medical records introduced was uncontroverted and documented that Mr. Lawrence began suffering from TMJ, back pain, headaches, and a left knee injury following the motor vehicle accident. See Jordan v. Travelers Ins. Co., 257 La. 995, 1006-08, 245 So.2d 151, 155 (1971). Mr. Lawrence began treatment three days after the motor vehicle accident and was still receiving treatment for some of these injuries at the time of the bench trial, which was over three years after the motor vehicle accident.
|8nAs mentioned above, the medical evidence “shows a reasonable possibility of a causal connection between the accident and the injury.” Johnson, 95-0003, 671 So.2d at 457. All of the medical experts testified that Mr. Lawrence suffered injuries from the motor vehicle accident. As such, upon our de novo review of all of the above-mentioned live testimony and medical records, we find a reasonable possibility of a causal connection between the motor vehicle accident and Mr. Lawrence’s alleged injuries and that Mr. Lawrence was entitled to the Housley presumption.
The burden then shifted to the Defendants to rebut the presumption “to prove that some other particular incident could have caused the injury.” Id. “Speculation does not create a realistic alternative cause.” Johnson, 95-0003, 671 So.2d at *936 458. At the bench trial, no evidence was presented to prove that another incident caused Mr. Lawrence’s injuries. There was speculation regarding an alleged basketball injury. However, Dr. Montgomery was informed by Mr. Lawrence that his knee buckled when he attempted to play basketball after the motor vehicle accident. Dr. Montgomery testified, even taking this knee buckling into consideration, that the motor vehicle accident injured Mr. Lawrence’s left knee and caused his inability to play basketball. Accordingly, we find that Mr. Lawrence’s headaches, back pain, TMJ, and left knee injury were caused by the motor vehicle accident.

GENERAL DAMAGES

“Normally the district court has vast discretion in awarding general damages.” Johnson, 95-0003, 671 So.2d at 459. As we are the trier of fact after conducting a de novo review, “[t]he award of’ general “damages must be based on” this Court’s new conclusions as to causation, “which is contrary to the |S1 conclusion of the trial judge.” Id. We have vast discretion in determining the award for general damages as the trier of fact. McDaniel v. Hamilton, 41,588, p. 7 (La.App. 2 Cir. 12/13/06), 945 So.2d 272, 276. “ ‘In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm.’ ” Dolmo v. Williams, 99-0169 (La.App. 4 Cir. 9/22/99), 753 So.2d 844, 847-48, quoting Gordon v. Willis Knighton Med. Ctr., 661 So.2d 991, 999 (La.App. 2 Cir. 6/21/95). “ ‘Instead, we set the award in an amount which is just compensation for the damages revealed by record.’” Id., 99-0169, 753 So.2d at 848, quoting Gordon, 661 So.2d at 999.
“General damages do not have a common denominator and are determined on a case by case basis.” Glasper v. Henry, 589 So.2d 1173, 1180 (La.App. 4th Cir.1991). General damages include “physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim’s life.” Id. “The primary objective in awarding damages is to restore the injured party to the position she was in immediately preceding the accident.” McCray v. Abraham, 550 So.2d 244, 248 (La.App. 4th Cir.1989). “Factors to be considered in assessing quantum for pain and suffering are severity and duration.” Glasper, 589 So.2d at 1180.
The trial court awarded Mr. Lawrence $50,000.00 in general damages without attributing the left knee injury and surgery to the motor vehicle accident. Thus, we must determine an appropriate amount including the knee injury and ACL reconstruction surgery.
This Court held that a $60,000.00 award for general damages to a plaintiff who “suffered cuts and bruises in the accident and injured her knee which required arthroscopic surgery for torn ligaments” was not an abuse of discretion. Rubino v. Louisiana Stadium & Exposition Dist., 619 So.2d 738, 740 (La.App. 4th Cir.1993). The Rubino plaintiff did not undergo arthroscopic surgery until almost three years after the motor vehicle accident and was more likely to suffer from arthritis in the future. Rubino, 619 So.2d at 741. A general damages award of $50,000.00 was not excessive for a plaintiff who “suffered a neck and back strain, an aggravation of her prior knee condition, resulting in arthroscopic surgery, and an eye injury resulting in uneven pupil sizes, possibly related to the cranial nerve.” Nusloch v. Browning-Ferris Servs., Inc., 97-528, p. 7 (La.App. 5 Cir. 11/25/97), 703 So.2d 794, 798.
*937 A general damages award of $150,000.00 to a plaintiff who suffered from “carpal tunnel syndrome of both wrists, a meniscus tear of the right knee,” “a herniated disk in the lumbar spine,” surgical procedures, and physical therapy was not excessive. Montgomery v. Kedgy, 44,601, p. 8 (La.App. 2 Cir. 8/26/09), 21 So.3d 980, 986. This Court also upheld a $300,000.00 general damage award to a plaintiff who underwent two knee surgeries. Jackson v. Cockerham, 05-0320, p. 7 (La.App. 4 Cir. 5/10/06), 931 So.2d 1138, 1143. Also, this Court upheld a $120,000.00 general damage award to a plaintiff who underwent loiee surgery, injections, and physical therapy for a fractured knee with continuing impairment. Todd v. Delta Queen Steamboat Co., 07-1518, pp. 12-13 (La.App. 4 Cir. 8/6/08), 15 So.3d 107, 116.
This Court awarded $7,000.00 for a plaintiffs “acute lumbosacral strain, an acute hip strain, and contusions to her hip, left foot, and left toe” following the reversal of the trial court regarding a slip and fall. Mosley v. Methodist Health Sys. Found., Inc., 99-3116, pp. 6-7 (La.App. 4 Cir. 11/15/00), 776 So.2d 21, 24. This Court also upheld an award of $30,000.00 for an incredible plaintiffs general | aadamages award related to soft tissue injuries, which lasted approximately six months. Joseph v. Archdiocese of New Orleans, 10-0659, p. 9 (La.App. 4 Cir. 11/10/10), 52 So.3d 203, 209. A general damages award of $30,000.00 was “reasonable” for a plaintiff who suffered from a “ten month soft tissue injury that is somewhat chronic in nature.” Charles v. Robinson, 08-0036, p. 6 (La.App. 4 Cir. 2/11/09), 5 So.3d 938, 941. Additionally, a $2,500.00 award of general damages was made by this Court to a plaintiff who endured approximately six months of headaches and soft tissue injuries. Chatelain v. Circle K Corp., 94-0227, p. 8 (La.App. 4 Cir. 10/13/94), 644 So.2d 1079, 1085.
Given our review of previous awards for general damages in cases with varying degrees of similarity to the present matter, we award Mr. Lawrence $150,000.00 in general damages for his injuries related to the motor vehicle accident.

SPECIAL DAMAGES

“[0]ur differing conclusion with the district court on causation requires us to conduct a de novo [sic] review of special damages.” Johnson, 95-0003, 671 So.2d at 459, citing Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980).

Past Medical Expenses

Mr. Lawrence submitted all of his past medical bills from the injuries we found were sustained as a result of the motor vehicle accident during the bench trial. The parties did not dispute that the total of the past medical bills submitted amounted to $83,706.88. Accordingly, we amend the trial court’s award for past medical expenses from $15,000 to $83,706.88, and render.
| ^Future Medical Expenses
Mr. Lawrence contends that the trial court erred by failing to award $395,438.68 in special damages for future medical expenses, which would include medicine for fifty years, bi-annual appointments with Dr. Voorhies, quarterly appointments with Dr. Trahant, future ESI, physical therapy for his back, and physical therapy for his knee.
“A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of an injury.” White v. Longanecker, 93-1122 (La.App. 1st Cir.5/23/94), 637 So.2d 1213, 1218. “Future medical expenses must be established with some degree of certainty and a plaintiff must show that *938 the expenses more probably than not will be incurred.” Crowther v. Kmart Corp., 568 So.2d 669, 675 (La.App. 4th Cir.1990). “The award of future medical expenses must be supported by medical testimony indicating both their need and probable cost.” Thibeaux v. Trotter, 04-482, p. 9 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, 1133. See also Duncan v. Kansas City S. Ry. Co., 00-0066, p. 17 (La.10/30/00), 773 So.2d 670, 685. However, “[fjuture medical expenses need not be established with mathematical certainty.” Pryor v. United Servs. Auto. Ass’n, 98-1371 (La.App. 4 Cir. 2/10/99), 729 So.2d 658, 663. “ ‘[W]hen the need for future medical care has been demonstrated but cost is not susceptible of determination, the court may make a reasonable award.’ ” Thibeaux, 04-482, p. 9, 883 So.2d at 1133, quoting Holliday v. United Servs. Auto. Ass’n, 569 So.2d 143, 146 (La.App. 1st Cir.1990).
Dr. Voorhies stated the following as to Mr. Lawrence’s possible future medical care needs: “[w]ell, the fact that the first one [ESI] was extremely beneficial suggests that a series of such injections might be added and cumulative. |3RSo this is a situation where we would recommend a series of injection [sic]. Meaning, generally up to three.” Dr. Voorhies testified that it was possible Mr. Lawrence would need more than one series of injections. However, Dr. Voorhies stated that given Mr. Lawrence’s “age and general good health” the symptoms would “ultimately ... fade away.” Given the uncertainty in Dr. Voorhies’ testimony regarding the necessity of future medical treatment for Mr. Lawrence’s back, we find that Mr. Lawrence failed to show more probably than not that an award for future medical expenses regarding office visits with Dr. Voorhies, future ESI treatments, and physical therapy for his back is warranted.
Dr. Montgomery testified that post-op ACL reconstruction patients “typically” require “six to nine months” or longer of physical therapy. Dr. Montgomery then stated that “other than the recommended physical therapy,”[16] Mr. Lawrence will require “as needed visits if he has complaints in the future.” Dr. Montgomery testified that the goal was to “get” Mr. Lawrence “as functional” as he can and that he was “not done with that process yet.” However, Dr. Montgomery did not state with specificity what kind of physical therapy or how many more months of physical therapy Mr. Lawrence needed. Also, there was no testimony regarding the cost of the three additional months of physical therapy Mr. Lawrence allegedly requires. Furthermore, the medical records submitted as evidence do not quantify the cost of the additional physical therapy. Accordingly, given the “as needed” nature of possible future appointments with Dr. Montgomery and the lack of certainty regarding whether additional physical therapy is required, we do not find that Mr. Lawrence sufficiently proved that | Sfifuture treatment with Dr. Montgomery is necessary.
As to possible future treatment for Mr. Lawrence’s headaches, Dr. Tra-hant testified that Mr. Lawrence was still treating with him at the time of the bench trial. Dr. Trahant testified that as long as Mr. Lawrence continues to experience headaches, he should remain on the Na-prelan indefinitely. Dr. Trahant then agreed that medically more probable than not, Mr. Lawrence would require the Na-prelan indefinitely. However, this conclusion requires the speculation that Mr. *939 Lawrence will continue to have headaches that necessitate the continued administration of Naprelan. Thus, Mr. Lawrence did not establish with certainty that he would require Naprelan indefinitely. See Duncan, 00-0066, p. 17, 773 So.2d at 685. Dr. Trahant did not testify that Mr. Lawrence would require future quarterly appointments. Therefore, we do not find that Mr. Lawrence proved the need for future medical expenses for the allegedly required appointments. Accordingly, after our de novo review of the record, we find that the trial court did not abuse its vast discretion when it found that an award for future medical expenses was unnecessary.

DECREE

For the above-mentioned reasons, we find that the trial court committed legal error in applying an adverse presumption to the medical records of one of the Mr. Lawrence’s doctors. We also find that the trial court committed legal error in failing to apply the Housley presumption to Mr. Lawrence’s injuries. After conducting a de novo review of the record, we find a causal connection between Mr. Lawrence’s left knee injury and the motor vehicle accident due to the overwhelming uncontro-verted testimony and evidence presented at trial. We amend the trial court’s award for special damages regarding past medical expenses, | S7increase the award to $83,706.00, and render. We do not find that the Mr. Lawrence met his burden of proof as to future medical expenses because of the speculative nature of the evidence provided as to necessity and cost of the alleged future medical treatment. Lastly, after our de novo review and given previous jurisprudence, we award $150,000.00 for general damages. Accordingly, we affirm in part, reverse in part, and render.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
BELSOME, J., dissents with reasons.

. Counsel in argument before the Court discussed the recusal and stated the trial court *922 “convinced us she could be fair and impartial” and filed'the withdrawal. We therefore find that the issue of recusal was not preserved for appellate review.

.Liability is not an issue in the appeal and all parties stipulated to the authenticity of the records submitted as evidence.

. Temporomandibular joint syndrome ("TMJ”).

. Anterior cruciate ligament ("ACL”).

. Mr. Lawrence asserted that Mr. Mark and the first driver reached an agreement wherein the first driver would leave the scene.

. Following Mr. Lawrence's response, Defendants’ counsel stated that $83,706.00 was indeed the total of all the medical bills submitted into evidence.

. Mr. Lawrence never asserted a claim for lost wages or lost earning capacity,

. Magnetic Resonance Imaging ("MRI”).

. Single Photon Emission Computed Tomo-gram ("SPECT").

. Dr. Voorhies recommended the SPECT scan in September 2010. However, his records indicated that Mr. Lawrence was leery of a SPECT scan because one of his aunt’s allegedly became ill following a SPECT scan. According to Dr. Voorhies, this caused the time delay from the recommendation to Mr. Lawrence undergoing the SPECT scan in May 2012.

.Computed Tomography (“CT”).

. "The rule is well settled that the treating physician’s testimony is entitled to greater weight than the testimony of a physician who only examines a plaintiff for diagnosis.” Fitch v. Vintage Petroleum, Inc., 94-346, p. 8 (La.App. 3 Cir. 11/2/94), 652 So.2d 998, 1001.

. Dr. Trahant’s typed report from September 20, 2011, notes that Mr. Lawrence’s "right knee hit the undersurface of the dashboard” during the motor vehicle accident. However, Dr. Trahant did not treat Mr. Lawrence’s knee injury and testified that reference to the right knee was a typographical error.

. Mr. Lawrence continued to treat with Dr. Trahant at the time of the bench trial.

. The evidence presented does not consist of "some medical testimony in support of plaintiff's contentions, and other medical testimony opposing his contentions, where the manifest error and abuse of discretion standards of appellate review require us to defer to the reasonable findings of the trier of fact.” Durham v. CNA Ins. Companies, 544 So.2d 679, 683 (La.App. 3rd Cir. 1989).

. Counsel for Mr. Lawrence stated "other than the recommended physical therapy.” Dr. Montgomery never testified that Mr. Lawrence definitively required additional physical therapy or for how long.